UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT COLE, JOHN ADAMS,
RICHARD S. LANTER, on behalf of
themselves and a similarly situated class, and
INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE, AND
AGRICULTURAL IMPLEMENT WORKERS
OF AMERICA,

                Case No. 03-73872

          Plaintiffs                (Consolidated with No. 04-73656)

v.                          Hon. Nancy G. Edmunds

ARVINMERITOR, INC.; ROCKWELL
AUTOMATION, INC.; and ROCKWELL
INTERNATIONAL CORPORATION,

          Defendants

_____/

BERNARD W. FAUST, LOIS E. LAST,
DAVID J. REAMER, and CHARLES A. SCHMIDT,
on behalf of themselves and a similarly situated class,
and INTERNATIONAL UNION, UNITED AUTOMOBILE,
AEROSPACE, AND AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA,

             Plaintiffs,
v.

ARVINMERITOR, INC., ROCKWELL
AUTOMATION, INC., and ROCKWELL
INTERNATIONAL CORPORATION,

          Defendants.

_____/

**ORDER GRANTING PRELIMINARY INJUNCTION**

**I. SUMMARY OF THE CASE**

1.  <u>The parties</u>.  Plaintiffs are six retirees and one surviving spouse (collectively, the "Retiree Plaintiffs") and United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW").  The Retiree Plaintiffs seek to represent a class of similarly-situated retirees, dependents, and surviving spouses.  Defendants are Rockwell Automation, Inc. and Rockwell International Corporation (collectively "Rockwell") and ArvinMeritor, Inc.

2.  <u>The litigation</u>.  This litigation is brought by the Retiree Plaintiffs and their union against the retirees' former employers and current benefits administrator.  It addresses the duration of retiree health benefits under a series of collective bargaining agreements that span five decades. Defendants plan to eliminate health benefits on January 1, 2006 for all retirees, dependents, and surviving spouses age 65 and over.  Defendants reduced and cancelled some health benefits for all retirees, eligible dependents, and surviving spouses in 2003 and 2005. Plaintiffs challenge Defendants' actions. This matter is now before the Court on the Retiree Plaintiffs' motion for preliminary injunction.  The Retiree Plaintiffs ask the Court:  (1) to enjoin Defendants from eliminating health benefits for retirees, eligible dependents, and surviving spouses age 65 and over as Defendants plan to do on January 1, 2006, and (2) to require Defendants to restore the *status quo ante* by undoing the already-imposed reductions and cancellations affecting the retirees, dependents, and surviving spouses.

3.  <u>The proposed class and their health benefits</u>.  The Retiree Plaintiffs seek to be certified as Rule 23 class representatives of a class of approximately 2,900 retirees and, in addition, the retirees' eligible dependents and surviving spouses.  The retirees retired from 12 plants owned

1

by Rockwell or, later, by Rockwell successors Meritor Automotive, Inc. and ArvinMeritor, Inc. The plants were in Michigan, Ohio, Wisconsin, Indiana, Illinois, and Kentucky. The 12 plants were closed or sold at various times between the early 1970s and 2003. The proposed class includes retirees who were represented by UAW at those plants and who, since retirement, have received retiree health benefits from Defendants. The proposed class also includes the retirees' dependents and surviving spouses who have received health benefits from Defendants due to their relationships to the retirees. In general, the class members' health benefits include medical, hospitalization, prescription drug, dental, hearing aid, and vision coverages and, for Medicare-eligible individuals, reimbursement of Medicare Part B premiums.

4.     <u>Benefits changes</u>.  In 1991, Rockwell added a mandatory mail and generic drug program for all retirees. These changes were made to cut down on the substantial costs of brand name drugs and to take advantage of bulk purchasing through mail order pharmacies. In 2000, Defendants announced that all *Faust/UAW* retirees who retired before January 1, 2001 would realize an increase in drug co-pays from $3 to $5 for generic drugs and $3 to $7 for brand name drugs. This represents an increase of 100%. In 2001, ArvinMeritor froze reimbursements for Medicare Part B premiums at the 1999 level (*i.e.*, $45.50) for age 65/older UAW retirees from closed plants. This change substantially increased out-of-pocket costs for all age 65/older retirees. At Medicare's 2005 monthly premium rate of $78.20, *Cole/UAW* retirees currently pay approximately $392.40 more per year as a result of ArvinMeritor's 2001 decision to freeze the Medicare Part B premium reimbursement at $45.50. The UAW agreed and acquiesced to these 2001 changes. In 2003 and 2005, ArvinMeritor, the administrator of the retiree health benefits, changed some of these benefits. ArvinMeritor cancelled the dental, hearing aid, and vision coverages. ArvinMeritor also increased

2

co-pays, deductibles and out-of-pocket maximums, and altered Medicare Part B reimbursements, resulting in increased costs to retirees, dependents, and surviving spouses.

5.     <u>Planned elimination of benefits</u>.  ArvinMeritor plans to eliminate remaining health benefits on January 1, 2006 for all retirees, dependents, and surviving spouses "age 65 or over."

6.     <u>The parties' main dispute</u>.  Plaintiffs contend that Defendants do not have the right to reduce or eliminate retiree health benefits, that these are lifetime benefits which individually vested at the time of each retiree's retirement.  Defendants contend that they have the right to reduce and eliminate retiree health benefits.

7.     <u>The legal basis</u>.  The Retiree Plaintiffs sue under Section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. §185, and Section 502(a) of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §1132(a).  Plaintiff UAW sues under LMRA Section 301.  Plaintiffs seek to prevent the elimination of benefits planned for January 1, 2006, to reinstate cancelled benefits, to undo already-imposed reductions, to be "made whole" for losses due to Defendants' actions, to preserve and continue the health benefits for the lifetimes of the retirees, eligible dependents, and surviving spouses, and to recover attorney fees and costs.

8.     <u>The preliminary injunction motion and opposition</u>.  The Retiree Plaintiffs filed their motion for preliminary injunction on October 18.  Defendants filed their opposition on November 15.  The Court will address whether the Retiree Plaintiffs are likely to prevail on the merits of their claims that the collective bargaining agreements promise lifetime retiree health benefits.  The Court also will address the other factors determining whether a preliminary injunction should issue in this retiree benefits litigation.  Based on the parties' arguments and exhibits, and on the hearing conducted on December 13, 2005, the Court addresses these and related issues below.

3

## II.  FINDINGS OF FACT

1.      The focus of this matter is the series of collective bargaining agreements between Plaintiff UAW and Defendants, negotiated between 1962 and 2000.  (Ex. 106-117, 157, 195-196).

2.      Rockwell.  Rockwell International Corporation was formed in 1973 in a merger between North American Rockwell and Rockwell Manufacturing.  Rockwell was a conglomerate of multiple divisions which owned and operated industrial plants throughout the United States, including plants supplying the automotive industry.  (*See* Ex. 528, Greb Af. ¶¶4-5).  In 2003, Rockwell International changed its name to Rockwell Automation.  Rockwell describes itself as a "leading industrial automation company ... with 5,600 distributors, systems integrators and agents serving customers in 80 countries."  (Ex. 181).

3.      Rockwell, Meritor, and ArvinMeritor.  In October 1997, Rockwell "spun-off" its automotive division, which became Meritor Automotive, Inc.  In July 2000, Meritor merged with Arvin Industries to form ArvinMeritor, Inc.  (Def. Facts ¶¶7-8).  ArvinMeritor describes itself as an "$8 billion supplier to the motor vehicle industry" with "approximately 31,000 employees in 25 countries," including 10,000 in the United States.  (Ex. 180).

4.      The 12 plants.  Rockwell owned various plants at which UAW was the collective bargaining representative of hourly employees.  (Ex. 528, Greb Af. ¶5).  Among these are the 12 plants at issue, located in Allegan, Chelsea, and Detroit, Michigan; Ashtabula (2 plants) and Marysville, Ohio; Oshkosh, Wisconsin; Knox, Indiana; Chicago (2 plants) and Centralia, Illinois; and Winchester, Kentucky.  (Ex. 102).  Rockwell, Meritor, or ArvinMeritor closed or sold each of the 12 plants over time, between the early 1970s and 2003.  (Ex. 104-105).

5.     <u>The collective bargaining agreements</u>.  In the period between 1962 and 2003, UAW and Rockwell, Meritor, or ArvinMeritor were parties to a series of "national" collective bargaining agreements governing the plants and UAW-represented employees.  (Ex. 102, 106-117, 157, 195, 196).  These agreements addressed pensions and retiree health benefits.  Company-paid retiree health benefits were established in 1962, with Rockwell paying one-half.  (Ex. 187).  In the 1965-1967 agreement, Rockwell became responsible for fully-paid retiree health benefits.  (Ex. 186, 187, 196).  The 1968-1971 agreement established the template for the core language regarding retiree health benefits continued in the 1971-1974, 1974-1977, 1977-1980, 1980-1983, 1982-1985, 1985-1988, 1988-1991, 1991-1994, 1994-1997, 1997-2000, and 2000-2003 national agreements.  (Ex. 106-117, 157).  Over those years, retiree health benefits required by the agreements improved in various ways -- e.g., prescription drug, dental, hearing aid, and vision coverages were added -- but the core contract language providing for company-paid health benefits for retirees, their eligible dependents, and their surviving spouses remained essentially unchanged.  (Def. Facts ¶¶10-11; Ex. 101, 106-117, 157).

6.     <u>The retirees and their benefits</u>.  There are approximately 2,900 living retirees from the 12 plants.  A census of the retirees provided by ArvinMeritor is Ex. 122.  Retirees from the 12 plants, their eligible dependents, and their surviving spouses have been provided with pension and retiree health benefits since at least 1962 by Rockwell, Meritor, and most recently, ArvinMeritor.

7.     <u>Plaintiffs' reliance on the collective bargaining agreements</u>.  Plaintiffs rely on collective bargaining agreement language that has been essentially unchanged over five decades.  That language is included in the insurance program made part of each collective bargaining agreement.  The insurance program provides for health benefits for active employees and their

5

dependents, for laid-off and other inactive employees and their dependents, and, pertinent here, for retirees, their dependents, and surviving spouses.

8.     The beginning of company-paid retiree health benefits.  Rockwell and UAW agreed to company-paid retiree health benefits effective February 1, 1962.  This is reflected in the January 6, 1962 letter agreement between Rockwell Vice President of Industrial Relations L.R. Lawton and UAW Co-Director George Merrelli.  (Ex. 187).  The agreement provided that "the Company shall pay one-half of the cost of hospital and surgical operations insurance for employees retired under the Hourly Rated Employees Pension Plan who elect such coverage."  Retiree health benefits were made available to employees retiring under the 1962-1965 agreement and to already-retired employees, including those who previously waived self-paid coverage:  "Present retirees who have heretofore waived insurance coverage shall be resolicited."  (Ex.  187).  "In consideration of the" company-paid retiree health benefits, Rockwell and UAW agreed to divert already-negotiated wage increases.  They agreed:  that 2¢ of "the general increase due and payable" on September 4, 1961 would be "allocated for insurance purposes, effective January 1, 1962" and that at various plants, the 1¢ "cost-of-living due and payable December 4, 1961 shall not be paid, but shall be allocated for active and retiree insurance."  (Ex. 187 at 2).

9.     Fully-paid retiree health benefits. The 1965-1967 agreement established Rockwell's obligation to fully pay the cost of health benefits for retirees, eligible dependents and surviving spouses.  (Ex. 186, 187, 196).  The 1968-1971 agreement established the core language that continued in all the later agreements between Rockwell (and later, Meritor and ArvinMeritor) and UAW.  The contractual framework, begun in 1965, includes (1) a "supplemental agreement" governing health benefits for active employees, retirees, and dependents "made part of" the national

6

agreement, designated Exhibit "B," and (2) incorporated into Exhibit "B," a detailed program of

health benefits "made part of" the supplemental agreement, designated Exhibit "B-1." (Ex. *See* Ex.

106 and 157). The 1965-1967 Exhibit "B" provided: "The Company agrees to pay the contributions

due from it for the Program in accordance with the terms and provisions of Exhibit B-1." (Ex. 186

at 4). That agreement, like the later agreements, set limits on the continuation of health benefits for

some employees -- e.g., for laid off employees (up to 12 months)(Ex. 186 at 4-6) -- but set none for

retirees. Exhibit "B-1" (revised January 1, 1965) provided, under the heading "Benefits for Retired

Employees" (Ex. 186 at 20):

> **Hospital, Surgical and Medical Expense Insurance.** Upon retirement under the
> Pension Plan these coverages will be continued during your retirement for yourself
> and for the eligible dependents who were covered under this plan at the time of your
> retirement. The full cost of this coverage will be paid by Rockwell Standard.
>
> All other coverages will be cancelled on the date of your retirement.

The 1968-1971 agreement and the later national agreements continued company-paid retiree health

benefits governed by the attached Exhibits "B" and "B-1," "all made part" of the national

agreements. (Ex. 106-117, 157).

10.    The insurance program. The "insurance program" consists of Exhibit "B" and "B-1"

to the main agreements. The main agreements also typically include a "Pension Plan" as Exhibits

"A" and "A-1" and a "Supplemental Unemployment Benefit Program" (SUB) as Exhibits "C" and

"C-1." In the 1990s, the SUB program was replaced by a Guaranteed Income Stream (GSI) program

for laid off employees. All the exhibits are negotiated and "made part" of the main collective

bargaining agreements "as if set out in full herein, subject to all provisions of" the main agreement.

(*See* Ex. 114, ¶N-144). For simplicity, the Court will use the 1991-1994 Rockwell-UAW agreement

7

as a typical example of language which, again, remained essentially unchanged over the five decades in question.  (*See* Ex. 106-117, 157).

11.     <u>The insurance exhibits</u>.  In particular, the Retiree Plaintiffs rely on several sections in Exhibit "B," which is titled "Supplemental Agreement (Insurance Program)," and Exhibit "B-1," which is titled "Rockwell International Corporation Insurance Program for Hourly-Rate Employees."  In particular, the Retiree Plaintiffs rely on sections that apply to "retired employees," their "eligible dependents," and "surviving spouses."

12.     <u>Exhibit "B"</u>.  Exhibit "B," Section 2(a), provides:  "The Company agrees to pay the contributions due from it for the Program in accordance with the terms and provisions of Exhibit B-1."  (Ex. 157, 1991-1994 Agreement, Exhibit "B" at 2).

13.     <u>Exhibit "B-1"</u>.  Exhibit "B-1," Article I, Section 3, is titled "Company Contributions and Administration."  In various paragraphs, it provides for company-paid health benefits for various categories of persons, including employees "in active service," employees on "layoff or leave of absence," and, pertinent here, retired employees and surviving spouses.

14.     Exhibit "B-1," Article I, Section (3)(b), is titled "Company Contributions for Health Care Coverages."  Section (3)(b)(6) is titled "For Retired and Certain Former Employees."  It ties retiree health benefits to pension status.  In pertinent part it provides (Ex. 114, Exhibit "B-1" at 19):

> The Company shall contribute the full premium or subscription charge for Health Care ... coverages continued in accordance with Article III, Section 5, for; (i) a retired employee (including any eligible dependents), provided such retired employee is eligible for benefits under Article II of the Company's Hourly-Rate Employees Pension Plan...

15.     The pension plan section referenced -- Article II of Exhibit "A-1" -- provides for various types of retirements, including "normal retirement" at age 65, "early retirement" based on

8

various formulas, including "30 and out" retirement, and disability retirement.  (*See* e.g., Ex. 157, 1991-1994, Exhibit "A-1" at 16-19, Ex. 114 at 16-19).

16.     Article III, Section 5 of Exhibit "B-1" is referenced in Article I, Section (3)(b)(6) of Exhibit "B-1" quoted above.  Article III is titled "Health Care Benefits."  (Ex. 114, Exhibit "B-1" at 65).  Section 5 is titled "Continuance of Health Care Coverages Upon Retirement or Termination of Employment at Age 65 or Older."  Section 5(a) addresses, among other things, "continuance" of health care coverages for pension-eligible retirees.  It provides in pertinent part (Ex. 114, Exhibit "B-1" at 72):

> The Health Care ... Coverages an employee has under this Article at the time of retirement ... shall be continued thereafter provided that suitable arrangements for continuation can be made with the Carrier(s).  Contributions for coverages so continued shall be in accordance with Article I, Section 3(b)(6).

17.     The Retiree Plaintiffs contend that this language, tying pension status to retiree health benefits -- and providing that the health benefits "at the time of retirement ... shall be continued thereafter" for retirees and "any eligible dependents" -- constitutes an enforceable contractual promise of lifetime retiree health benefits to accompany lifetime pension benefits.

18.     Similarly, regarding "surviving spouses," Retiree Plaintiffs rely on Exhibit "B-1." Article I, Section 3(b)(7) of Exhibit "B-1" provides in pertinent part (Ex. 157, 1991-1994 Agreement, Exhibit "B-1" at 20):

> (i) The Company shall make monthly contributions for the following month's (sic) Health Care ... Coverages on behalf of a surviving spouse as defined in Article III, Section 6(b)(1)(2)(3) and (4) ... and the eligible dependents of any such spouse; provided, however, that the contributions on behalf of a surviving spouse for the month the surviving spouse becomes age 65 and subsequent months shall be made only for months that the surviving spouse has the voluntary coverage that is available under the Federal Social Security Act by making contributions.

9

The reference to Federal Social Security Act coverage is to Medicare Part B coverage available to those age 65 and over.  Article IV, Section 1 of Exhibit "B-1" provides for reimbursement of retiree-paid Medicare Part B premiums.  It provides in part (*See* Ex. 157, 1991-1994 Exhibit "B-1" at 75):

> A retiree who is enrolled for Medicare coverage that is available by making monthly premium payments under the Federal Social Security Act, will, while so enrolled, receive a monthly benefit equivalent to the premium then in force provided the retiree is receiving a monthly pension benefit.

> A surviving spouse who is enrolled for such Medicare coverage will receive the same monthly benefit, provided the surviving spouse is receiving a monthly pension benefit [excluding spouses of certain former employees who received deferred pensions].

19.     Article III, Section 6 of Exhibit "B-1" is titled "Continuance of Health Care ... Coverages for Surviving Spouse of an Employee, a Retired or Certain Former Employee."  It also ties surviving spouse benefits to pension status.  Article III, Section 6(b), referred to in Article I, Section 3(b)(7), provides in pertinent part (Ex. 114, Exhibit "B-1" at 73):

> The Company shall make suitable arrangements for a surviving spouse:  (1) of [a] ... retired employee ... if such spouse is receiving or is eligible to receive a survivor benefit under Article II of the Company's Hourly-Rated Employees Pension Plan, [or] (2) of a retired employee if, prior to the retiree's death, the retiree was receiving a benefit under Article II of the Hourly-Rated Employees Pension Plan, [or] .... (4) of an employee who at the time of death was eligible to retire on an early or normal pension under Article II of the Company's Hourly-Rated Pension Plan, to participate in the Health Care ... coverages referred to in Section I of this Article ....

20.     <u>Context evidence</u>.  Retiree Plaintiffs point out that Exhibit "B-1" differentiates between active employees, inactive employees, and retirees and surviving spouses with regard to "continuance" of health benefits.  For example, active employees, laid-off employees, employees on leaves of absence and SUB-eligible employees all are subject to specific durational limitations.  Employees in "active service" are entitled to continued company-paid health benefits for "any month in which the employee has earnings from the Company."  (Ex. 114 at 15, Exhibit "B-1," Article I,

10

Section 3(a)(1)).  When an employee is laid off from active service, or takes a leave of absence, health benefits are continued only in the first month after the month of layoff or the beginning of the leave.  (Ex. 114 at 18, Exhibit "B-1," Article I, Section 3(b)(2)(i)).  Laid-off employees eligible for SUB benefits under Exhibit "C" and "C-1," however, are entitled to continued health benefits under a schedule, determined by seniority, for up to 24 months after they become inactive.  (Ex. 114 at 69, Exhibit "B-1," Article III, Section 3(a)).  In contrast, retiree benefits are not subject to any durational limits.  Rather, retiree benefits begin "at the time of retirement" and "shall be continued thereafter." (Ex. 114, Exhibit "B-1," Article III, Section 5(a) at 72).  Citing cases discussed below[1] -- which also addressed agreements that "specifically set durational limits on health care benefits" for laid-off and other employees and "no such limitation" for retirees -- the Retiree Plaintiffs contend that this context demonstrates that company and union negotiators know how to set specific limits on the continuation of health benefits, did so for employees on lay off and leave, but set no limits on retirees, their dependents, and their surviving spouses.

21.    Written "lifetime" admissions.  The Retiree Plaintiffs also contend that over decades Defendants made numerous written admissions that contractual health benefits begin at retirement and are intended to continue "thereafter," i.e., for the lifetimes of retirees, dependents, and surviving spouses.  In particular, the Retiree Plaintiffs offer what they call the "lifetime" letters, written by different Rockwell, Meritor, and ArvinMeritor benefits officials to retirees, dependents, and surviving spouses between 1988 and 2001.  Here, the "lifetime" letters include the following (emphasis added):

---

[1]*Golden v. Kelsey-Hayes Co.*, 954 F.Supp. 1173, 1187 (E.D. Mich. 1997) and *Yolton* v. *El Paso Tennessee Pipeline Co.*, 318 F.Supp. 2d 455, 466-67 (E.D. Mich. 2003).

11

A.    A letter from Rockwell Retiree Insurance Supervisor Jan Howard in California to retiree Earnest Green in Ohio in 1988 in response to his inquiry "regarding medical insurance for your spouse upon your death" assuring Mr. Green: "As I indicated to you during our telephone conversation, please be advised that your surviving spouse *will continue* to receive all health insurance benefits upon your death, even though she will not receive an ongoing monthly pension check. *She will have the health insurance for the rest of her lifetime, at no cost*." (Ex. 142).

B.    A letter from Rockwell Benefits Representative Dorothy Musser in Michigan to surviving spouse Marian Camplese in Ohio in 1988 assuring Mrs. Camplese: "*You will continue to have your medical, dental, vision, hearing aid and prescription drug coverage at no cost to you for your lifetime*." (Ex. 143).

C.    A letter from Rockwell Benefits Department official Michelle Dural in Michigan to surviving spouse Tessie Fitzgerald in Ohio 1989 assuring Mrs. Fitzgerald: "*You will continue to have your medical, dental, vision, hearing aid and prescription drug coverage at no cost to you for your lifetime*." (Ex. 144).

D.    A letter from Rockwell Benefits Department official Michelle Dural in Michigan to surviving spouse Kaynette Murphy in Ohio in 1990 assuring Mrs. Murphy: "*You will continue to have medical, dental, vision, prescription drug, and hearing aid coverage at no cost to you for your lifetime*." (Ex. 145).

E.    A letter from Rockwell Benefits Representative Dorothy Musser in Michigan to surviving spouse Kaynette Murphy in Ohio in 1990 assuring Mrs. Murphy: "*Medical, dental, vision, hearing aid and prescription drug coverage will continue for your lifetime*." (Ex. 146).

F.    A letter from Rockwell Retirement Administration official Lisa Veratudela in California to retiree Ken Gayheart in Kentucky in 1990 assuring Mr. Gayheart: "*Your pension benefit along with your insurance benefits will last the duration of your lifetime*." (Ex. 147).

G.    A letter from Rockwell's Automotive Benefits Office in Michigan to surviving spouse Irene Miller in Michigan in 1993, assuring Mrs. Miller: "*You will continue to have medical, dental, vision, hearing aid and prescription drug coverage at no cost to you for your lifetime*. When filing claims in the future, please use your social security number for prescription drug and dental claims and your husband's social security number for medical hearing aid and vision claims." (Ex. 148).

H.    A letter from Rockwell Automotive Benefits official Angie LaFontaine in Michigan to retiree Gary VanSlyke in Ohio in 1995 re "Medical Insurance for spouse," assuring Mr. VanSlyke: "In your letter you state the concern for medical coverage

12

for your spouse if you should pass away. *Under your plan, your wife will have medical coverage for the rest of her life if you pass away*." (Ex. 149).

I.      A letter from Rockwell Automotive Benefits official Angie LaFontaine in Michigan to surviving spouse Margaret Lipp in Ohio in 1995 assuring Mrs. Lipp: "*You will continue to have medical, dental, vision, hearing aid and prescription drug coverage at no cost to you for your lifetime*." (Ex. 150).

J.      A letter from Rockwell Retiree Operations official Shannon Hall in California to retiree Robert Cole in Ohio in 1989 re "Your Recent Inquiry" assuring Mr. Cole that if he should "choose to commence early retirement benefits" at age 50, and if "your wife should survive you ... *your insurance benefits would continue to your wife throughout her lifetime*." (Ex. 134).

K.      A handout from Rockwell Human Resources Coordinator Kathy Klatt in Wisconsin given to employee Robert Boese in 1995 assuring him: "*As a retiree, you will continue your medical, dental, prescription drug, vision, and hearing aid coverages as provided in the contract*." (Ex. 177).

L.      A handout from Meritor Human Resources Coordinator Kathy Slife (formerly Klatt) in Wisconsin given to employee David Reamer in 1998 assuring him: "*As a retiree, you will continue your medical, dental, prescription drug, vision, and hearing aid coverage as provided in the contract*." (Ex. 139).

M.      A letter from ArvinMeritor Benefits Administrator Patty Molnar in Michigan to retiree Donald Durkovic in Ohio in 2001 assuring Mr. Durkovic "in response" to his "written request" that his life insurance amount would be reduced when he reached age 65 and "remain" at the reduced amount "for the rest of your life" and: "*In addition, your spouse will continue to be covered, for life, under your current retiree medical benefits in the event of your death*." (Ex. 141).

N.      A letter from Rockwell Benefits Department official Michelle Dural in Michigan to surviving spouse Joanne Stewart in Ohio in 1990 expressing "condolences" on "your husband's death" on "behalf of Rockwell International" and assuring Mrs. Stewart: "*You will continue to have your medical, dental, vision, hearing aid and prescription drug coverage at no cost to you for your lifetime*. Please be sure to use your social security number for your prescription and dental coverage from now on." (Ex. 182).

22.    "For life" prescription cards. In addition, the Retiree Plaintiffs point to prescription

drug cards issued to retirees by Rockwell's insurance carrier (emphasis added):

A.      A card issued to retiree Clyde K. Hornbuckle reading: "Retiree Prescription Drug Plan valid as of July 1, 1972 *for life*." (Ex. 151).

13

B.     A card issued to retiree James Lisuzzo in Michigan reading:  "Retiree Prescription Drug Plan valid as of October 1, 1973 *for life*."  (Ex. 152).

C.     A card issued to retiree Anderson Daniels in Ohio reading "Retiree Prescription Drug Plan valid 10/01/82 *For Life*."  (Ex. 176).

D.     A card issued to Jennie Felice reading "Retiree Prescription Drug Plan valid 09/26/72 *FOR LIFE*."  (Ex. 188).

23.     <u>Other written assurances</u>.  Rockwell, Meritor and ArvinMeritor provided other written assurances tying retiree health benefits to pension status and addressing duration, promising that health benefits "will be continued during your retirement."  These are in decades of Rockwell health benefits booklets, summary plan descriptions (SPDs), and closing agreements.  For example, (emphasis added):

A.     The 1968 Rockwell insurance benefits booklet provides:  "Upon retirement ... under the Pension Plan" health benefits "*will be continued during your retirement for yourself and for the eligible dependents*."  (Ex. 174 at 2, 3).

B.     The 1971 Rockwell insurance benefits booklet provides:  "Upon retirement under the Pension Plan these [health] coverages *will be continued during your retirement for yourself and for the eligible dependents*."  (Ex. 173 at 41).  The booklet also states that company-paid health benefits will be paid for retirees and for surviving spouses "*for life*."  (Ex. 161 at 59; Ex. 173 at 59).

C.     The 1974 Rockwell insurance benefits booklet provides:  "Upon retirement under the Pension Plan these [health] coverages *will be continued during your retirement for yourself and for the eligible dependents*."  (Ex. 172 at 44).

D.     The 1977 Rockwell SPD provides:   "Upon retirement under the Pension Plan these [health] coverages *will be continued during your retirement for yourself and for the eligible dependents*...."  (Ex. 170 at 70).

E.     1980 Rockwell SPD provides:   "Upon retirement under the Pension Plan these [health] coverages *will be continued during your retirement for yourself and for the eligible Dependents*."  (Ex. 169 at 82).

F.     The 1985 Rockwell SPD provides:   "Upon retirement under the Pension Plan these [health] coverages *will be continued during your retirement for yourself and for your eligible Dependents*."  (Ex. 168 at 94).

14

G.   1988 Rockwell SPD provides: "Upon retirement under the Pension Plan these [health] coverages *will be continued during your retirement for yourself and for your eligible Dependents*." (Ex. 167 at 71).

H.   The 1991 Rockwell SPD provides: "These [health] coverages *will be continued during your retirement for you and your eligible Dependents*." (Ex. 165 at 48).

I.   The 1994/1995 Rockwell SPD provides: "These [health] coverages *will be continued during your retirement for you and your eligible Dependents*." (Ex. 164 at 49).

J.   The 1997/1998 Meritor SPD provides: "These coverages [health] *will be continued during your retirement for you and your eligible Dependents*." (Ex. 163 at 54).

K.   The 2000/2001 ArvinMeritor SPD provides: "These coverages *will be continued during your retirement for you and your eligible Dependents*." (Ex. 162 at 120).

L.   The March 30, 1987 Rockwell-UAW plant closing agreement governing the Ashtabula, Ohio brake plant created a "Special Early Retirement" option described in the testimony of UAW negotiator Roger Bernardez. The agreement provided that those retirees "*will have insurance coverage provided by the Company when pension payments commence*." (Ex. 193, ¶30).

M.   The July 1987 Rockwell-UAW plant closing agreement governing the Rockwell Damen Avenue Amforge Plant in Chicago, Illinois also created a "Special Early Retirement" option and provided that those retirees "*will have insurance coverage provided by the Company when pension payments commence*." (Ex. 194, ¶24).

24.   Oral "lifetime" statements.   Retiree Plaintiffs also point to the testimony and declarations of various individuals regarding statements made in the 1970s, 1980s, and 1990s by different Rockwell, Meritor, and ArvinMeritor human resources, personnel, and benefits officials (emphasis added).

A.   The testimony and declaration of Roger Bernardez, former local union president and UAW International representative, who participated in the negotiations of the 1980-1983, 1982-1985, and 1985-1988 Rockwell-UAW national collective bargaining agreements and the 1987 Rockwell Ohio brake plant closing agreement, and who participated in approximately 20 meetings from the mid-1970s until the 1987 Ohio brake plant closing between about-to-retire employees and Rockwell personnel officials addressing retirement benefits. Mr. Bernardez describes statements made at the negotiations and at the retirement benefits meetings demonstrating that

15

Rockwell officials recognized that retiree health benefits were lifetime benefits, to continue for the duration of the lives of retirees, eligible dependents and surviving spouses. Mr. Bernardez identifies participants as including national Rockwell negotiators John Needham and George Babic, Rockwell plant closing negotiators John J. Hinnegan, Richard Stevens, and Marge Smith, and Rockwell Ohio brake plant personnel representatives Mr. Babic, Ms. Smith, Wayne Juby, and Maggie Anderson. The statements during national discussion were made during negotiation of economics. For example, Mr. Bernardez testified about the 1980 negotiations:

"Well, there was lots of discussion about health care cost. The company was complaining, you know, that it kept increasing, and it came up numerous times that the burden of lifetime benefits for retirees, the cost of benefits for retirees, lifetime benefits.

There was discussion when we asked for a raise they said that well, how about cutting back three or four cents and we'll divert that to help pay for lifetime benefits for retirees. " (Ex. 199 at 30-31).

Mr. Bernardez testified that similar discussions "came up in every negotiation." (Ex. 199 at 37). Mr. Bernardez testified that during discussion of the "special early retirement" option, negotiated in the 1987 brake plant closing agreement, union and company negotiators agreed that retiree benefits were *lifetime* and *for life* and *forever*. (Ex. 199 at 20, 27). Similarly, Mr. Bernardez testified that the personnel officials told about-to-retiree employees that retiree health benefits were *for life*. (Ex. 199 at 92-93, 104-108).

B.   The declaration of Lulabelle McCoy, plaintiff in the *McCoy* case, that Rockwell official Frank Firenzik at the Illinois plant told her in 1984 that Rockwell retirees were entitled to *lifetime* benefits. (Ex. 131, ¶10). Ms. McCoy's declaration was filed and is cited in *McCoy*, 390 F.2d at 423-424.

C.   The declaration of former Rockwell official Sharon Huggins, whose job it was to meet with UAW-represented employees about to retire at the Illinois plant, that she told those employees they would get *lifetime* benefits. (Ex. 132, ¶¶2-7). Ms. Huggins' declaration also was filed in the *McCoy* case.

D.   The declaration and testimony of former union retiree chairman Robert VanSlyke that on more than 75 occasions in the 1970s and 1980s he accompanied about-to-retire employees to meetings with Rockwell personnel officials in Ohio who told the employees that union retirees and spouses got *lifetime* health benefits. (Ex. 118, ¶4). Mr. VanSlyke testified, for example, that Rockwell official Maggie Anderson was the company representative at most of these meetings, that she told about-to-retire employees and Mr. VanSlyke that retiree benefits were "for life," that this assurance was part of Ms. Anderson's regular presentation to about-to-retire employees, and

16

that she would point to the Rockwell benefits book -- her "bible" -- when making the "for life" assurance. (Ex. 210, 15, 65, 73-76). Mr. VanSlyke identified the portion of the benefits book pointed to by Ms. Anderson, highlighted by him and made Exhibit 2 to his deposition. That portion reads: "Upon retirement under the pension plan these coverages will be continued during your retirement for yourself and for the eligible dependents." (Ex. 210 at 15).

E.   The testimony of Ruth Cole, spouse of plaintiff and retiree Robert Cole, who attended two Rockwell-sponsored "outreach" programs for workers about to be laid off or retire in connection with the 1997 Ohio brake plant closing. The programs were held in hotel conference rooms, attended by 20 or 30 hourly employees and spouses, and conducted by trainers provided through Rockwell. At one meeting devoted to resume writing, the trainers used a "flip chart" to identify things to include in a resume and things to exclude. The trainers listed as a "plus" that Rockwell retirees have lifetime medical benefits. One wrote "lifetime medical benefits" on the "flip chart" using a "big black magic marker." (Ex. 212 at 25-29). The other meeting addressed interviewing and, during a "mock interview," the "moderator" told the interviewee "to present yourself that you would be a bargain to your new employer because you have health benefits for life." (Ex. 212 at 29-34).

F.   The testimony and declaration of Edith Sickler, who is married to 1983 retiree William Sickler, that Rockwell official Margaret Anderson in Ohio told her in 1984 or 1985 that the Sicklers' health benefits were *for life* and that if Mr. Sickler were to die, Mrs. Sickler's benefits would continue for her *lifetime*. (Ex. 133, ¶¶4-5; Ex. 211).

G.   The testimony and declaration of 1989 retiree Jacques Aute that he was told on eight occasions by three different Rockwell officials -- including Margaret Anderson and Marge Smith -- in 1987 that if he selected the early retirement option offered in connection with the 1987 Ohio brake plant closing he would have health benefits *for the rest of his life*. (Ex. 135 ¶¶5-7; Ex. 198 at 39, 57-58, 60, 63-69, 75-76, 82, 85-89).

H.   The testimony and declaration of union benefits representative Dean Garber that he attended meetings at the Kentucky plant on at least a dozen occasions when Rockwell official Tommy Cox told about-to-retire employees that when they retired they and their spouses would have *lifetime* retiree health benefits. (Ex. 136, ¶¶4-7; Ex. 204, at 15-17, 61, 70-73, 79-80, 86, 90-91, 95-96). For example, Mr. Garber testified that "each and every time" Mr. Cox said it was a "lifetime" benefit. Mr. Garber testified: "That's what people worried about is the rest of their life, and ... we were assured it was through Tommy Cox." (Ex. 204 at 71).

I.   The testimony of plaintiff Richard Lanter that Rockwell official Tommy Cox told him on the day Mr. Lanter retired in 1992 in the Kentucky plant: "You've got it

17

made ... you've got insurance and a pension *for the rest of your life*."  Mr. Lanter testified that he worked at Rockwell for 26 ½ years and "hated every day of it" but continued to work "for the benefits."  (Ex. 205 at 35-37, 42, 88).

J.      The testimony of John Kozel, who attended a Rockwell-sponsored "outplacement" meeting of approximately 200 hourly employees about to be laid off or retire due to the 1987 Ohio brake plant closing.  The meeting was conducted by trainers who advised employees, who would be taking early retirement from Rockwell and seeking work elsewhere, to emphasize that they had lifetime retiree health benefits as a way to make themselves more attractive to prospective employers.  The trainers said that lifetime retiree health benefits were "a good tool to use" in job interviews.  (Ex. 213 at 21, 24, 35-37).  Mr. Kozel also testified that he was told by Maggie Anderson, "head of personnel" at the brake plant, that he "would have my health benefits when I retired for the rest of my life."  (Ex. 213 at 26).

K.      The testimony and declaration of former supervisor Robert Boese, who chose to retire under the union contract in 1995, that he was told by Rockwell officials at the Wisconsin plant that he would have *lifetime* retiree health benefits.  (Ex. 137, ¶¶1-8; Ex. 201 at 15-17, 61, 70-73, 79-80, 86, 90-91, 95-96).  In addition, Rockwell human resources coordinator Kathy Klatt gave Mr. Boese a handout in 1995 that read in part:  "As a retiree, you will continue your medical, dental, prescription drug, vision, and hearing coverage as provided in the contract.  (Ex. 201 at 15-17).

L.      The testimony and declaration of former supervisor Richard Boese who, like his brother Robert Boese chose to retire under the union contract in 1995, that he was told by Wisconsin plant personnel official Dave McCuen in a supervisors' meeting conducted by Mr. McCuen that supervisors who retired under the hourly program and their wives would have *lifetime* retiree health benefits.  (Ex. 138, ¶¶1-8; Ex. 200 at 58-59, 68-69, 83).  Mr. Boese testified that at the meeting Mr. McCuen said with regard to health benefits that Mr. Boese "would be taken care of under the union program for the duration of my retirement."  (Ex. 200 at 83).

M.      The testimony and declaration of Plaintiff David Reamer that in December 1998 Wisconsin plant Human Resources Coordinator Kathy Slife told Mr. Reamer and his wife, Dianne Reamer, that Mr. Reamer's medical, dental, optical, hearing, and prescription drug coverage would continue *throughout his retirement* and that if he were to die, Mrs. Reamer would continue to get health benefits *for the rest of her life*.  Mr. Reamer testified that Ms. Slife told him his insurance would be for "the duration of his retirement."  (Ex. 208 at 46).  Mr. Reamer testified that when Ms. Klatt said this, she also gave him a handout that read, in part:  "As a retiree, you will continue your medical, dental, prescription drug, vision, and hearing and coverage as provided in the contract."  (Ex. 139, ¶¶6-11; Ex. 208 at 46, 48).

18

N.   The testimony and declaration of Dianne Reamer that Meritor official Kathy Slife told her and her husband, David Reamer, at the Wisconsin plant in December 1998, that the Reamers would have *lifetime* retiree health benefits, and that if Mr. Reamer died, Mrs. Reamer would continue to get health benefits *for the rest of her life*. (Ex. 140, ¶¶4-7; Ex. 209 at 27).  Mrs. Reamer testified that Ms. Slife told her that "if my husband should die, I would receive part of his pension and I would receive his -- or my health coverage, my dental, my vision and my hearing for the rest of my life." (Ex. 209 at 27).

25.   <u>Plaintiffs' contention that they are likely to prevail</u>.  The Retiree Plaintiffs contend that the agreement language, legal precedents discussed below, the agreement read in "context" and as an "integrated whole," Defendant's written admissions in letters, insurance booklets, and SPDs, the officials' oral assurances and other "extrinsic" evidence, independently and collectively, demonstrate that the Retiree Plaintiffs are likely to prevail on the merits of their claims for lifetime retiree health benefits.  In addition, the Retiree Plaintiffs present testimony and declarations addressing the other factors prerequisite to a preliminary injunction in a retiree health benefits case, including "irreparable injury," the balance of harms and the public interest.

26.   <u>Defendants' opposition</u>.  Defendants oppose a preliminary injunction.  Defendants contend that "the labor agreements clearly and unambiguously" limit retiree health benefits "to the duration of the agreements creating them."  Defendants rely on the agreements' general durational clauses.  They also offer analysis of the agreements and their "context," executives' declarations, and "extrinsic" evidence of 2003 SPDs and alleged unilateral benefits changes.  These contentions, the law, and the application of the law to the facts, are addressed below.

### III.  CONCLUSIONS OF LAW

District courts consider four factors when addressing preliminary injunction motions:  (1) "plaintiffs' likelihood of success on the merits"; (2) "whether the plaintiffs could suffer irreparable harm without the injunction"; (3) "whether granting the injunction will cause substantial harm to

19

others"; and (4) "the public interest." *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 653 (6th Cir. 1996). The Court will address these factors in the following paragraphs, beginning with the "merits" factor.

    A.  <u>Plaintiffs are likely to succeed on the merits of their claim.</u>

    Retiree Plaintiffs rely on various decisions from the Eastern District of Michigan and the Sixth Circuit, which the Retiree Plaintiffs refer to as the *Golden-Meridian* precedents, and they rely on other similar decisions.

    The *Golden-Meridian* precedents identified by Plaintiffs are: **(1)** *McCoy v. Meridian Automotive Systems, Inc.,* No. 03-74613 (E.D. Mich. Feb. 6, 2004)(O'Meara, J.)(granting preliminary injunction for retirees based on the 1991-1994 Rockwell-UAW agreement)(Ex. 569); **(2)** *McCoy v. Meridian Automotive Systems, Inc.*, 390 F.3d 417 (6th Cir. 2004) (upholding preliminary injunction for retirees based on the 1991-1994 Rockwell-UAW collective bargaining agreement); **(3)** *McCoy v. Meridian Automotive Systems, Inc.*, No. 03-74613 (E.D. Mich. Feb. 28, 2005)(O'Meara, J.)(Ex. 129)(granting summary judgment for retirees based on the 1991-1994 Rockwell-UAW agreement); **(4)** *Golden v. Kelsley-Hayes Co.*, 845 F.Supp. 410 (E.D. Mich. 1994)(Gadola, J.)(granting preliminary injunction for retirees based on language "virtually identical" to that in the 1991-1994 UAW-Rockwell agreement); **(5)** *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648 (6th Cir. 1996)(affirming decision to grant preliminary injunction); and **(6)** *Golden v. Kelsey-Hayes Co.*, 954 F.Supp. 1173 (E.D. Mich. 1997)(Gadola J.)(granting summary judgment for retirees).

    Other cases relied on by the Retiree Plaintiffs as addressing language "similar" to that addressed in *Golden v. Kelsey-Hayes* are: **(1)** *Hinckley v. Kelsey-Hayes Co.*, 866 F.Supp. 1034, 1041 (E.D. Mich. 1994)(Gadola, J.) and **(2)** *Yolton v. El Paso Tennessee Pipeline Co.*, 318 F.Supp. 2d 455, 466-467 (E.D. Mich. 2003)(Duggan, J.).

Retiree Plaintiffs point out that the identical (*McCoy*), "virtually identical (*Golden*)," and "similar" (*Hinckley* and *Yolton*) language addressed in the *Golden-Meridian* precedents, and the *Hinckley* and *Yolton* decisions tie retiree health benefits to pension status, and that all of those cases were decided in favor of retirees.  Retiree Plaintiffs contend that the language tying retiree health benefits to pension status -- and the language providing that the health benefits a retiree has "at the time of retirement ... shall be continued thereafter" -- unambiguously promises lifetime retiree health benefits and that this question is, in any event, settled by application of the *Golden-Meridian* precedents and the decisions in *Hinckley* and *Yolton*.

Aside from the agreements, Retiree Plaintiffs offer other evidence that they contend confirms that retiree health benefits were intended by the agreements to be for the lifetimes of retirees, dependents, and surviving spouses.  They point to *UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983), which provides the analytical framework for addressing collectively-bargained retiree health benefits, and which specifies the sorts of evidence and considerations that may be used to aid court review.

       1.     The "*Yard-Man* inference."  *Yard-Man* recognized that retiree benefits are "typically understood as a form of delayed compensation or reward for past services...."  716 F.2d at 1482.  The Sixth Circuit formulated "the *Yard-Man* inference" recognizing that health benefits tied to pension status are "likely" intended to be for the retirees' lifetimes:

> [R]etiree benefits are in a sense "status" benefits which, as such, carry with them an inference that they continue so long as the prerequisite status is maintained.  Thus, when the parties contract for benefits which accrue upon achievement of retiree status, there is an inference that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree.

*Id*. at 1482.

21

2.     The *Yard-Man* principles.  Under *Yard-Man*, the Court is to apply "the basic principles of contract interpretation."  It "should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent."  *Id*. at 1479.  The Court may also consider "context" to ascertain the "intended meaning" of agreement language.  The Court "should also interpret each provision in question as part of the integrated whole."  *Id*.  The Court must construe the agreement's terms "so as to render none nugatory and avoid illusory promises."  *Id*.  at 1480.  *Yard-Man* instructs:  "Where ambiguities exist, the court may look to other words and phrases in the collective bargaining agreement for guidance."  *Id*.  "The aim in such cases is to settle on an interpretation which is harmonious with the entire agreement."   *Golden*, 73 F.3d at 654.  If this analysis does not resolve ambiguities, the Court then may consider "extrinsic" evidence of the parties' intent.  *See Golden*, 954 F.Supp. at 1183; *McCoy* 390 F.3d at 422; *Yard-Man*, 716 F.2d at 1480, n. 1.  Here, Retiree Plaintiffs offer both "context" and "extrinsic" evidence to support their contention that the agreements promise lifetime retiree health benefits.  That evidence is summarized below.

3.     The "explicit language" of the agreements.  As noted, *Yard-Man* provides the analytical framework for assessing collectively-bargained retiree benefits promises.  Under *Yard-Man*, the Court first will assess the "explicit language" of the collective bargaining agreements and apply "basic principles of contract interpretation."  716 F.2d at 1479-1480.

a.     Lifetime promises.  The Court finds that the explicit language of the agreements ties retiree health benefits to pension status and specifically promises, without time limitation, that the health benefits "at the time of retirement ... shall be continued thereafter" for the duration of retirement.  The Court concludes that the agreements promise health benefits for each

22

retiree's lifetime and for the lifetimes of each retiree's eligible dependents and surviving spouses. The Court's conclusion mirrors that in the *Golden-Meridian* precedents, as exemplified by the decision granting summary judgment in favor of the Retiree Plaintiffs in *Golden*. That decision is based on language virtually identical to the language in the agreements here, and concludes that:

> the language in the agreements directly tie[s] retiree eligibility for health care coverage to pension entitlement and therefore is a clear indicia that [the company] intended to provide lifetime health care coverage.

*Golden*, 954 F.Supp at 1187.

The *Golden* Court also considered the "veritable mountain" of "extrinsic" and "course of conduct" evidence presented in support of the retirees, but clarified that:

> Even absent the course of conduct or extrinsic evidence, this court would grant summary judgment in favor of plaintiffs as the express contract language in this case is even more compelling than that found in *Yard-Man*.

*Id*. at 1188.

The language addressed is, as noted, "virtually identical" to the language in the UAW-Rockwell/Meritor/ArvinMeritor agreements. *See McCoy*, 73 F.3d at 422 (language in 1991-1994 Rockwell-UAW agreement "virtually identical" to language addressed in *Golden*).

This Court agrees with the *Golden* court in both respects. <u>First</u>, the express contract language in *Golden* and in this case clearly ties health retiree benefits to pension status and clearly manifests the contracting parties' intention to provide lifetime retiree health coverage. <u>Second</u>, here this intent is confirmed by the same sort of evidence presented in *Golden* -- contractual context; written "lifetime" assurances to employees, retirees, and surviving spouses by multiple company benefits officials; decades of booklets and SPDs promising that health benefits "will be continued during retirement" for both retirees and "eligible dependents"; numerous explicit oral assurances of

23

"lifetime" coverage made by company officials in various plants over decades; the early expression of "for life" intent stated in a 1971 Rockwell benefits book (Ex. 161) and on the retiree insurance cards issued in 1972, 1973, and 1982 (Ex. 151-152, 176, 188); and the testimony and declarations of witnesses demonstrating that the negotiated security of lifetime pension and health benefits was widely-known, understood and communicated for decades among union-represented employees and supervisory employees, and by company and union negotiators at collective bargaining of national and plant closing agreements.

   b. <u>Application of the *Golden-Meridian* precedents</u>. The *Golden-Meridian* precedents are mirror images of the instant case. *McCoy* defendant Meridian took over the former Rockwell plant in Centralia, Illinois and adopted the 1991-1994 Rockwell-UAW insurance agreement. The *McCoy* decisions not only address identical language, they address the identical agreement. The Court does not find persuasive Defendants' arguments attempting to distinguish the *McCoy* decisions. Defendants in essence assert that the *McCoy* case was badly defended and erroneously decided. Defendants' premise is that *McCoy* defense counsel, the district court, and the Sixth Circuit all were deficient, and that Defendants here have unique insight. The Court disagrees and concludes that the *McCoy* decisions, which rejected the same arguments made by Defendants here, are reasoned and persuasive.

  As noted, the *Golden* decisions, two by the district court and one by the Sixth Circuit, addressed language virtually identical to that in the 1991-1994 Rockwell-UAW agreement, as noted in *McCoy*, 73 F.3d at 420. *Hinckley* and *Yolton* addressed "similar" language. *See Hinckley*, 866 F.Supp. at 1042 n. 7 ("in this case, as in *Golden* ... the text of the insurance agreement provisions directly support[s] the inference that retiree health benefits are vested"); *Yolton*, 318 F.Supp. 2d at

466 (the "express language" is "similar to" that in *Golden*). All these decisions found for the retirees. Defendants contend that *Golden*, *Hinckley*, and *Yolton* also miss the point. The Court disagrees and finds that these decisions are persuasive. Like *McCoy*, these decisions demonstrate that language tying retiree health benefits to pension status -- in particular language which promises that retiree health benefits begin "at the time of retirement" and "shall be continued thereafter" -- do indeed unambiguously promise lifetime health benefits.

        c.     <u>Defendants' misplaced reliance on durational clauses</u>. The Court's decision is based on the plain language of the agreement. It is confirmed by the agreements' context. Reading the agreements' terms as an integrated whole mandates rejection of Defendants' main argument, that general durational clauses in the collective bargaining agreements and the insurance agreements override the "shall be continued thereafter" promise. Defendants do not contest that the language promising that health benefits began "at the time of retirement" and "shall be continued thereafter" reflects the intent that retiree benefits never expire. Nor could Defendants credibly do so, particularly in light of the *Golden-Meridian* precedents. Rather, Defendants contend that those earlier decisions missed the point, and that *McCoy* failed to apply a contractual "rule of construction" by which Exhibit "B" supercedes the lifetime promises in Exhibit "B-1" with the former's general durational clause adopting the general durational clause in the collective bargaining agreement. Against all authority and logic, Defendants argue that "the labor agreements clearly and unambiguously" limit retiree health benefits "to the duration of the agreements creating them." Defendants rely on *UAW v. Cleveland Gear Corp.*, No. C83-947, 1983 WL 2174 (N.D. Ohio, Oct. 20, 1983), and brush aside the *Golden-Meridian* precedents and the other cases that have rejected

25

Defendants' expiration argument.  The Court concludes that Defendants' analysis is without merit for several reasons.

General durational clauses do not override specific promises of lifetime benefits.  In *Golden,* 954 F.Supp. at 1184, 1186-1187, the Court addressed the defendants' argument that the "shall be continued thereafter" language merely defined "eligibility" for retiree health benefits and "not length of entitlement."  The *Golden* defendants argued that length of entitlement should be determined by the general durational clauses in the main and supplemental insurance agreements.  Defendants here make identical arguments.  In *Golden*, the court rejected these arguments as a "strained reading of the contract provisions" and, as noted, held:  "the language in the agreements directly tie[s] retiree eligibility for health care coverage to pension entitlement and therefore is a clear indicia that [the company] intended to provide lifetime health care coverage."  *Id.* at 1186-87.  Indeed, it is well-settled that general duration clauses do not override promises of lifetime health benefits.  *See Golden*, 845 F.Supp. at 414-415 ("such provisions only refer to the length of the agreement and not the period of time contemplated for retiree benefits"); *Fox v. Massey-Ferguson, Inc.*, 172 F.R.D. 653, 677 (E.D. Mich. 1995), *aff'd sub nom Fox v. Varity Corp.*, 93 F.3d 143, 1996 WL 382272 (6th Cir. 1996)(same); Hinckley, 866 F.Supp. at 1041 ("general durational clauses that refer to the expiration of the collective bargaining agreement" say "nothing about the duration of particular benefits, especially benefits for retirees"); *Yard-Man*, 716 F.2d at 1482-83 (language showing that "retiree benefits were intended to outlive the collective bargaining agreement's life and outweigh any contrary implications derived from a routine durational clause terminating the agreement generally").

Defendants' reliance on *Cleveland Gear* is misplaced. *Cleveland Gear* turned on general duration clauses because the agreements were "totally void of any language from which an intent to create lifelong insurance benefits can be inferred." 1983 WL 2174 at *3. In contrast, here the agreements contain explicit language tying retiree health benefits to pension status -- and the "shall be continued thereafter" language. This is the same language held to constitute enforceable lifetime promises in the *Golden-Meridian* precedents. *See also Yolton*, 318 F.Supp. 2d at 467 (citing both *Golden* and *Yard-Man* for the point that "[a]bsent specific limitations on the duration of particular benefits, the courts have held that such provisions say nothing about the duration of those benefits."). In *Yolton*, the Court distinguished the agreements in that case from those at issue in *Cleveland Gear*. It observed that the *Cleveland Gear* agreements were "totally void of any language from which an intent to create lifelong benefits [could] be inferred," whereas the language in the *Yolton* agreements was "similar to" that in *Golden*, because they "expressly contain such language" tying "retirees' and surviving spouses' eligibility for health care coverage to their eligibility to receive a pension." *Yolton,* 318 F.Supp. 2d at 467 (internal quote and citation omitted).

Defendants critique *McCoy* as badly defended and as wrongly decided by the district court and the Sixth Circuit Court of Appeals. Defendants criticize: "Crucially, [*McCoy v.*] *Meridian* never cited *Cleveland Gear*." (Def. Br. at 21). Of course not, because *Cleveland Gear* was wholly inapposite. *McCoy* was not "totally void" of language tying pension status to retiree benefits. Rather, *McCoy* addressed the same "shall be continued thereafter" language recognized by *Golden* to be "even more compelling than that found in *Yard-Man*." *Golden*, 954 F.Supp. at 1188. The Sixth Circuit agreed, finding the language to be "virtually identical to the agreement at issue in *Golden*, in which this Court held that retirement-health benefits vested upon retirement." *McCoy*,

27

390 F.3d at 422 (citing *Golden*, 73 F.3d at 656). Further, Defendants ignore that *McCoy* addressed the 1991-1994 UAW-Rockwell agreement, one of the very same agreements at issue here. (*See* Ex. 101, 114 and 157). There could hardly be a stronger case in favor of the retirees, who seek to enforce the same agreement enforced in *McCoy*, the same language enforced in *Golden*, and language similar to that enforced in *Hinckley* and *Yolton*, all cases which rejected the list of arguments that Defendants recycle here. In short, Defendants' reliance on failed arguments, general duration clauses, and *Cleveland Gear* is baseless. The "shall be continued thereafter" language constitutes a specific promise of lifetime retiree health benefits, enforceable under LMRA and ERISA, just as was held in the *Golden-Meridian* precedents granting preliminary injunctions and summary judgment for retirees. This specific language is not overridden by general duration clauses.

The Court's conclusion is confirmed by the context of the retiree health benefits language, including its relation to the pension benefit language, and by reference to the agreements' pension plan duration clauses. As Plaintiffs demonstrate in Ex. 159, each pension agreement -- Exhibit "A" -- has a durational clause virtually identical to the durational clause in Exhibit "B" in each insurance agreement. Both "A" and "B" incorporate the durational clauses in the main agreements. If Defendants' theory was to be applied, it would require the determination that pension benefits were subject to cancellation at the expiration of the agreement under which a retiree took retirement. In other words, if the insurance agreement duration clause overrides the lifetime health benefits promise, the same duration clause in the pension plan overrides lifetime pension benefits. This is contrary to any common sense understanding of pension benefits, which are understood to be for life. This precise point was made in *Golden* and *Hinckley*, where the court rejected "defendant's

28

logic" because it would end a company's "obligation to provide pensions to past retirees ... with the expiration of the current agreement."  *Golden*, 845 F.Supp. at 415, n.1; *Hinckley*, 866 F.Supp. at 1041, n.4.  Such reasoning also is contrary to decades of retiree benefits law.

Defendants' reliance on what they call a "rule of construction" is also misplaced.  Defendants cite to Exhibit "B," Section 1, which provides that in the case of a conflict between Exhibit "B" and Exhibit "B-1," the former will "supercede ... to the extent necessary to eliminate such conflict."  (*See* Ex. 157, 1991-1994, Exhibit "B" at 1).  Defendants then argue that the general durational clause in Exhibit "B" conflicts with and must override the "shall be continued thereafter" language in Exhibit "B-1."  The lack of merit in this argument is demonstrated (1) by the precedence given specific promises over general durational clauses, and (2) by reference to Exhibit "A."  As noted, Exhibit "A"  governing pensions has a general duration clause virtually identical to that in Exhibit "B."  It also has the same "rule of construction" provision, providing that in the case of conflict between Exhibit "A" and Exhibit "A-1," the former will "supercede ... to the extent necessary to eliminate such conflict."  (*See* Ex. 157, 1991-1994, Exhibit "A" at 1).  There is no conflict to be resolved.  As discussed, general durational clauses are not in conflict with -- and do not override -- specific promises of benefits that begin "at the time of retirement" and are to be "continued thereafter."  Again, to credit Defendants' complicated argument, the Court would have to hold that neither pension nor retiree health benefits were intended to be lifetime, because they both were overridden by general durational clauses.  Again, this is contrary to the specific agreement language, it is contrary to the cases that have rejected virtually identical arguments (*Golden*, 845 F.Supp. at 415, n.1; *Hinckley*, 866 F.Supp. at 1041, n.4), and it is contrary to common sense.  Moreover, it would improperly render the promises of retiree benefits -- pension and health -- nugatory and illusory.

More narrowly and specifically, Defendants' argument is contrary to the 1997 promise to UAW that "Meritor will assume responsibility for the retiree health care and life insurance benefits to be provided to current and future retirees" while Rockwell retains "any liability" it may have "with respect to these benefits." (Ex. 120). If retiree health benefits expired as Defendants now argue, Meritor would have had no reason in 1997 to "assume responsibility" for "current" retirees -- many of whom retired in the 1970s and the 1980s under long-since expired agreements -- and Rockwell would have had no continued liability under those long-since expired agreements. Nor would Meritor and ArvinMeritor have had any reason to negotiate "retiree medical cost caps" providing for cost-sharing of premium increases above a formula-based threshold, with a downward adjustment or freeze first when a retiree "reaches Medicare eligibility" (i.e., age 65), and later when the retiree "reaches age 80." (*See* Ex. 157, 2000-2003 agreement at 87). These cost-controlling caps are future oriented, and govern retiree health costs for decades after expiration of the agreements in which they appear. The only reasonable conclusion is that the agreements intend that both pension and retiree health benefits are to continue for the lifetimes of retirees, eligible dependents, and surviving spouses.

d. <u>More context</u>. Defendants' argument also is refuted by reference to the agreements' contrasting treatments of benefits continuation for non-retirees as compared to retirees. Under *Yard-Man*, agreement language must be read as an "integrated whole" and so as to "render none nugatory and avoid illusory promises." Were the Court to adopt Defendants' argument, it would render "nugatory" the specific durational limits on the continuation of health benefits for laid-off and other employees, and would ignore the absence of any such limitation on retirees, their dependents, and surviving spouses. Moreover, it would turn the "shall be continued

30

thereafter" language into an "illusory promise" in contravention of basic contract interpretation principles. As discussed ahead, *Yard-Man*, *Golden* and *Yolton* reach this same conclusion.

As Plaintiffs point out, the contracting parties set specific limits on continuation of health benefits for laid-off employees (one month), employees on leave of absence (one month), and SUB-eligible employees (depending on seniority, up to 24 months). In marked contrast, there are no limits on retiree health benefits. Retiree health benefits begin "at the time of retirement" and "shall be continued thereafter." The plain meaning of this language is that once retirement status is attained, health benefits are to continue "thereafter," i.e., for the duration of retirement. As recognized in *Yard-Man*, retiree status is lifetime. 716 F.2d at 1482.

If the contracting parties wanted to set durational limits on benefits, they knew how to do so. They did so for active employees, for laid off employees, and for employees on leave, and for SUB-eligible employees. The fact that they set no such limit on retirees demonstrates their intent to provide retirees with health benefits for the entire duration of their retirements, for their lifetimes. *See Golden*, 954 F.Supp. at 1187 (comparing 12-month limit on continued health benefits for laid off employees with the absence of any limit on retirees); *Yolton*, 318 F.Supp. 2d at 466 ("Further supporting a finding that the parties in this case intended retiree health care benefits to vest, is the fact that the Group Insurance Plans contain no express limitations on the duration of such benefits. In comparison, the plans do set forth express limitations on the duration that other categories of employees are entitled to such benefits. For example, active employees on lay-off or on leave are entitled to continued group insurance benefits according to a specific schedule"); *Yard-Man*, 716 F.2d at 1481-1482 ("the inclusion of specific durational limitations in other provisions ... suggests that retiree benefits, not so specifically limited, were intended to survive...").

31

The Court finds that the only reasonable interpretation of the agreement language is that retiree health benefits were intended to last beyond the duration of the particular agreement that created them for those retiring during the term of that agreement.  The Court finds that the intent was to distinguish between various categories of employees for specific purposes.  For example, continuation of health benefits for SUB-eligible employees for up to 24 months is intended to cushion the hardship of layoff.  Continuation of health benefits tied to pension status is intended to provide retirees with the lifetime security of health benefits.  This purpose is accomplished by language promising that health benefits "at the time of retirement ... shall be continued thereafter." The Court finds that the agreement language manifests the intention that health benefits for retirees, their eligible dependents, and their surviving spouses -- like retiree status and pension benefits -- continue for life.

        4.    <u>Additional evidence</u>.  Although the unambiguous language of the agreements does not require the consideration of extrinsic evidence, the additional evidence submitted by Plaintiffs supports their claim for lifetime benefits.  This includes Defendants' admissions and extrinsic evidence of Defendants' intent to provide lifetime retiree health benefits, what the Retiree Plaintiffs refer to as Defendants' "words and deeds."

Defendants' admissions include the "lifetime" letters (Ex. 134, 139, 141-150, 182).  These come from different Rockwell, Meritor, and ArvinMeritor officials in Michigan, California, and Wisconsin.  They come from officials who held titles like "Retiree Insurance Supervisor," "Benefits Representative" and "Benefits Administrator."  They come from company offices with names like "Benefits Department," "Retirement Administration," "Automotive Benefits Office," and "Retiree Operations."  They span the 13 year period between 1988 and 2001.  They were sent to retirees and

surviving spouses in Michigan, Ohio, Kentucky, and Wisconsin.  Nine expressly use the word

"lifetime."  Others use the words "life" "will continue" and "for life."  The Court concludes that

these letters reflect company policy and are admissions by Defendants of the lifetime duration of

retiree health benefits.  *See Golden*, 954 F.Supp. at 1188 (citing the defendants' benefits

representatives written assurances of lifetime health coverage).

Defendants' acknowledgment of the lifetime duration of retiree health benefits is reflected,

too, in the decades of Rockwell health benefits booklets and SPDs which promise that company-paid

retiree health benefits are "for life" (Ex. 161 at 59) and "will be continued during your retirement"

for retirees and dependents.  The agreement language -- "shall be continued thereafter" -- and the

booklet language -- "will be continued during your retirement" -- are definitive proof that the

duration of retiree health benefits coincides with the duration of retirement.

Defendants' acknowledgment of the lifetime duration of retiree health benefits is reflected,

too, in the testimony and declarations of  retirees, spouses, and former union representatives who,

in a variety of settings over the course of four decades, were assured by company officials in

Michigan, Wisconsin, Kentucky, and Ohio on more than 100 occasions that retiree health benefits

last for the lifetime of retirees, dependents, and surviving spouses.  *See Golden*, 954 F.Supp. at 1188

(citing the defendants' benefits representatives' oral assurances of lifetime health coverage) and

*McCoy*, 390 F.3d at 423-424 (same).  These assurances were accompanied early on by the 1971

Rockwell health benefits book which states that health benefits for retirees and surviving spouses

are company-paid and "for life."  (Ex. 161 at 59).  The assurances were accompanied by the "for

life" prescription drug cards issued by Rockwell's carrier in 1972, 1973, and 1982 (Ex. 151-152,

176, and 188), by Mr. Yost's 1997 assurance that retiree health insurance "will be provided" by the

newly-created manifestation of Rockwell's automotive operations, Meritor (Ex. 119), and by Mr. Brown's and Mr. Greb's 1997 promise to UAW that Meritor "will assume responsibility for the retiree health care and life insurance benefits to be provided to current and future retirees." (Ex. 120, emphasis added). "Current" retirees at the time of that 1997 letter were those who retired in the 1960s, 1970s, 1980s, and earlier in the 1990s, under long-since expired agreements. Defendants' assurances were accompanied, too, as discussed ahead, by decades of Defendants' health benefits booklets which assured retirees: "Upon retirement under the pension plan, these coverages will be continued during your retirement for yourself and for your eligible dependents." (Ex. 162-175). In short, as in *Golden*, aside from the agreements themselves, there is substantial evidence supporting the Retiree Plaintiffs. *See* 954 F.Supp. at 1188 (holding that the agreement language itself promises lifetime retiree health benefits and further observing that: "With the addition of course of conduct and extrinsic evidence, however, a veritable mountain of evidence is created which defendants have failed to surmount.").

Defendants invoke various April 1, 2003 SPD which broadly assert ArvinMeritor's alleged unilateral authority to terminate health benefits. The 2003 SPDs are dated on the same day that ArvinMeritor cancelled the retirees' vision, dental, and hearing aid coverage and made other changes, all challenged in this litigation. Defendants cannot justify breaching their agreements on April 1, 2003 by issuing booklets self-declaring Defendants' authority to breach the agreements. Nor can Defendants' unilateral actions nullify their obligations under the collective bargaining agreements. As noted, the five decades of SPDs and benefits booklets issued by Rockwell, Meritor, and ArvinMeritor before 2003 all have language that supports Plaintiffs, making Defendants'

34

prerogatives "subject to" the collective bargaining agreements.  They also promise that health

benefits  "will be continued during your retirement for you and your eligible dependents."[2]

Defendants allege they made changes in 1991, 2000, 2001, 2003, 2005 and intend to make

additional changes in 2006.  This, they argue, shows their unilateral authority over the duration of

retiree health benefits.  This is unpersuasive.  The seven 2003-2006 "changes" listed by Defendants

give them no support.  Four are directly challenged in this litigation, and one of those is the change

planned for next January.  Again, Defendants seek to justify their breaches by *post hoc* citations to

their breaches.  The other changes do not support Defendants.  The 1991 change did not diminish

benefits; it altered the mechanism for buying drugs and resulted in savings for retirees, and in any

---

[2] The five decades of Rockwell SPDs and benefits booklets refute Defendants and support Plaintiffs. For example (emphasis added): the SPD issued in 2000/2001 provides: "These coverages will be continued during your retirement for you and your eligible Dependents."  It states the company's intention "to continue the Plan indefinitely" with a "reservation" of the "right to amend or terminate" which is "Subject to the provisions of any Collective Bargaining Agreement."  (Ex. 162).  Similar "will be continued" and "subject to" language appears in SPDs issued in 1997/1998, 1994/1995 and 1991.  (Ex. 163-165).  The 1989 SPD assures that the company will take no action to "cancel all or any part of the coverages and benefits" without compliance with "any collective bargaining obligation."  (Ex. 166).  The 1988, 1985, 1980, and 1977 SPDs state:  "Upon retirement under the Pension Plan these coverages will be continued during your retirement for yourself and your eligible dependents" and requires the company comply with the negotiated insurance agreement.  (Ex. 167-170).  The 1977 dental booklet is "subject to the terms of the UAW Agreement" and provides coverage for retirees' surviving spouses "until their death."  (Ex. 171).  The 1974, 1971 and 1968 booklets provide:  "Upon retirement under the pension plan, these coverages will be continued during your retirement for yourself and for your [or the] eligible dependents."  (Ex. 172-175).  Similar language -- "will continue to provide medical, prescription drug and hearing aid coverage to all employees who retire" and changes are "subject to the provision of any applicable collective bargaining agreement" -- was in the SPDs addressed in *McCoy*, where the court rejected the defendant's argument that the SPDs somehow weakened agreement language which "calls for those benefits to vest upon retirement."  390 F.3d at 424-425.  Finally, a crystal clear expression of Rockwell's intent is in the 1971 benefits booklet which expressly states that health benefits for retirees and surviving spouses are company-paid "for life."  (Ex. 161 at 59).

event was *de minimis*.   The other changes as described by Defendants -- including increased prescription co-payments --were agreed to by UAW.   (*See* Ex. 528, Greb Af. ¶11, Def. Facts ¶29). In short, there is no history of unilateral material changes.   Even if there were, it would be of no consequence.   *See Hinckley*, 866 F.Supp. at 1042 ("merely because plaintiffs chose not to bring suit on earlier changes does not mean that they have tacitly admitted that their benefits are limited and terminable.   Instead, it merely indicates that the substance of the more recent changes have prompted them to seek relief"); *Helwig v. Kelsey-Hayes Co.*, 857 F.Supp. 1168, 1174, n. 2 (E.D. Mich. 1994)(tolerating earlier changes, like unilaterally increased prescription co-payments, does not bar suit on later changes); *Schalk v. Teledyne, Inc.*, 751 F.Supp. 1261, 1266-1267 (W.D. Mich. 1990) (tolerating earlier changes, like collectively-bargained increased prescription co-payments "that no one objected to," does not bar suit on later changes), *aff'd* 948 F.2d 1290 (6th Cir. 1991).

Finally, Defendants argue that there are no union proposals for lifetime retiree health benefits or union literature trumpeting this valued right.   It is not proposals or supposed union reticence that is significant, however; it is Defendants' words and deeds.   Whatever proposals crossed the bargaining table in the 1960s, the parties agreed to language which explicitly ties retiree health benefits to pension status, and which promises that coverages an employee has "at the time of retirement ... shall be continued thereafter."   That language or its equivalent appears in 13 national agreements, governing retirements from 1965 to 2003.   The genesis of this language fifty years ago is meaningless.   It was agreed to by both parties.   Moreover, the absence of proposals is persuasively explained in the testimony of UAW negotiator Roger Bernardez.   When asked by defense counsel why UAW made no written proposal for lifetime retiree health benefits in the 1980, 1982, and 1985 negotiations, Mr. Bernardez explained: "... didn't need one.   It was there." (Ex. 199 at 92).   Indeed,

36

the "shall be continued thereafter" language was agreed to in 1968, and was preceded by similar language dating back to 1962.  Mr. Bernardez also testified about the status of retiree health benefits in the 1980s: "We already had them."  (*Id*. at 89-90).

Over five decades (until recently), Defendants complied with the "shall be continued thereafter" language.  Defendants have over five decades provided fully-paid retiree health coverage for retirees under agreements that have long-since expired, some decades ago.  Mr. and Mrs. Adams and Mrs. Furgo are examples.  Mr. Adams retired in 1973; Mrs. Furgo's husband retired in 1970.  Mr. Adams and Mrs. Furgo's husband worked in Rockwell's Detroit plant.  The plant closed in the early 1970s. (Ex. 105).  The last agreement that included the Detroit plant expired in 1974, 31 years ago. (Ex. 102, 107).  During those years, Rockwell, Meritor, and ArvinMeritor provided Mr. and Mrs. Adams, the late Mr. Furgo, and Mrs. Furgo with fully-paid retiree health benefits.  More than three decades of uninterrupted retiree health benefits promised in two agreements which expired in the 1970s refute Defendants' contention that retiree health benefits, unlike pension benefits, were intended to expire with the agreement promising those benefits.

Defendants offer declarations in support of their conclusion that there never was agreement on lifetime retiree health benefits.  These declarations are not persuasive.  They are insufficient to counter the explicit agreement language.  They are inadequate to overcome the substantial evidence confirming that the benefits were intended and understood by Defendants to last for the lifetimes of retirees, eligible dependents, and surviving spouses.[3]

---

[3]A.   The Stone declaration.  The declaration of Joel Stone, who held various management positions with Rockwell between 1973 and 2001, purports to be on "personal knowledge."  In fact, it is largely argument, opinion, legal conclusion, and factual conclusion without adequate foundation.  Mr. Stone states that a UAW proposal for lifetime retiree health benefits "could not" have been agreed to by Rockwell

negotiators without approval by "Corporate," and "would have never been approved by Rockwell due to the expense and implications of such a proposal." (Ex. 532 ¶¶3-6). Mr. Stone states that, to his "knowledge," "vested lifetime insurance benefits" were "never proposed" by UAW. He states that if Rockwell "ever considered such a proposal" he "would have known about it." Mr. Stone does not account for the undisputed fact that Rockwell agreed to "will be continued during your retirement" language in 1965 and to the "shall be considered thereafter" language in every national agreement beginning in 1968. Indeed, there is nothing in Mr. Stone's declaration indicating that he was aware of this language in the national agreements. Mr. Stone also does not account for the fact that in 1962, Rockwell approved the first of a long series of insurance booklets and SPDs promising that health benefits "will be continued during your retirement for yourself and for the eligible dependents who were covered under this plan at the time of your retirement," or that in 1971 Rockwell issued an insurance booklet that promised company-paid health benefits to retirees and surviving spouses "for life." Perhaps, Mr. Stone would not have known about these 1962, 1965, 1968, and 1971 events because he began with Rockwell in 1973. In any event, Mr. Stone's declaration does not evidence that he has any knowledge of proposals or events or agreements that predated his tenure or of the salient documents during his tenure.

Mr. Stone's sweeping observation about the absence of any union proposal for lifetime retiree health benefits during his 1973-2001 tenure lacks sufficient foundation to constitute a definitive statement of the facts. In any event, it is answered by the testimony of Roger Bernardez. As noted, Mr. Bernardez was a UAW negotiator during 1980, 1982, and 1985 national Rockwell-UAW collective bargaining. The following colloquy is between Mr. Bernardez and defense counsel (emphasis added):

Q.     During your experience in these rounds of negotiations, have you ever seen a union written proposal to make health benefits lifetime?
A.     We didn't have to make a proposal.
Q.     So the answer --
A.     They were lifetime.
Q.     So the answer would be during those three rounds of negotiations you didn't see any written proposal to make the benefits lifetime?
A.     *No, we already had them.*
* * *
Q.     And your employment with Rockwell began in 1965?
A.     Yes.
Q.     Did retirees receive lifetime benefits before you began your employment?
A.     Yes.

38

Q.     So it was in a prior collective bargaining agreement no less?

A.     I would say so, yes.

* * *

Q.     So, prior to your negotiations during those three periods of time, prior to that had you every seen a lifetime proposal from the UAW in writing that says that health benefits should be for life?

A.     *No, didn't need one.  It was there*."  (Ex. 199 at 89-90, 92).

As Mr. Bernardez testified, the promise of lifetime retiree health benefits was in the agreements' language providing that the health benefits "at the time of retirement shall be continued thereafter."  (Ex. 199 at 31-35).   That precise language was "there" in every agreement governing every retirement between 1968 and 2003.

Mr. Stone presumes to state Rockwell's "belief, understanding and intent when it entered into agreements."  He also offers what the union "never communicated" to Rockwell about retiree benefits.   While Mr. Stone may have held responsible positions during his 28 years at Rockwell, there is nothing in his declaration that provides a foundation for such sweeping statements about the "belief, understanding, and intent" of such a large and diverse corporation over five decades, including time periods predating Mr. Stone's employment and progression to the higher corporate ranks.   Nor is there any foundation for his sweeping statement about what UAW may have "communicated" to Rockwell over five decades.   Both Rockwell and UAW are large institutions and any one executive is hardly in a position to monitor all communications.   Mr. Stone goes on to offer his legal opinion: that Rockwell's "contractual obligation to provide retiree insurance benefits ended" upon "the expiration of each collective bargaining agreement."   That legal question is not resolved by Mr. Stone's opinion.   It is resolved, as indicated, by reference to the "shall be continued thereafter" language and the fact that the agreements tie retiree health benefits to pension status.   Mr. Stone's opinion is merely a restatement of Defendants' argument, which the Court finds to lack foundation and merit.

At the end, Mr. Stone offers something factual, that no "company official ever informed or indicated to me, in writing or otherwise, that insurance benefits for UAW retirees, spouses and dependents were vested lifetime benefits."   While this may be true, the state of what was "indicated" to Mr. Stone by company officials is of no consequence.   Whatever Mr. Stone was told or not told, the agreement language and the substantial confirming evidence proves that the parties intended -- and informed employees, retirees and dependents orally and in writing -- that retiree health benefits were to begin at the "time of retirement" and were to continue "thereafter," i.e., for life.

39

B.   <u>The Stickland declaration</u>.  The declaration of Gary Strickland, the "chief negotiator for ArvinMeritor during the 2000-2003 collective bargaining negotiations with the UAW concerning the National Contract," similarly offers a restatement of Defendants' argument.   Mr. Strickland states: "During the time I served as a negotiator for ArvinMeritor, the UAW never proposed and ArvinMeritor never agreed to provide insurance benefits for the duration of the lives of retirees, spouses and dependents."  (Ex. 529 ¶¶3-4).  Mr. Strickland, like Mr. Stone, does not account for the fact that ArvinMeritor and UAW agreed to continue the long-standing language promising that retiree health benefits begin "at the time of retirement" and "shall be continued thereafter."  As noted, this language was held in *Golden* in 1994, 1996 and 1997 to promise vested, lifetime retiree health benefits.  ArvinMeritor's 2000 agreement to continue this language belies Mr. Strickland's declaration.  Mr. Strickland does not address the 2000/2001 SPD, which is "subject to the provisions of any Collective Bargaining Agreement" and promises:  "These coverages will be continued during your retirement for you and your eligible dependents."  (Ex. 162 at 120).  The agreement and the SPD language are diametrically opposed to Mr. Strickland's suggestion that ArvinMeritor was unaware of the company's commitment to the lifetime duration of retiree benefits, i.e., "during your retirement."

C.   <u>The Crotty, Ooms, and Needham declarations</u>.  The declarations of M. Patrick Crotty, Andrew Ooms, and John Needham suffer from similar infirmities.  Mr. Crotty was a Rockwell negotiator in the 1971, 1974, and 1977 national negotiations.  Mr. Ooms was a Rockwell negotiator in the 1982, 1985 and 1988 national negotiations.  Mr. Needham was a Rockwell negotiator at the 1977, 1980, and 1982 negotiations.  All offer abstractions and conclusions similar to those offered by Mr. Stone and Mr. Strickland, about what was agreed, intended, and proposed.  Again, they do not address the definitive indicator of what was agreed, the "shall be continued thereafter" agreement language spanning five decades.  They do not address the negotiated limits on continuation of health benefits for those on lay-off or leave compared to the absence of limits for retirees.  They do not address the "will be continued" retiree benefits language in the 1971 and 1974 insurance booklets and the 1977, 1980, 1985, 1988, 1991, 1994/1995, 1997/1998, and 2000/2001 SPDs. (Ex. 162-175). Again, all the defense declarations merely restate the Defendants' arguments.  They lack foundation and specificity, and they ignore the express contract language that Rockwell agreed to at every national negotiation since 1962.

Defendants' words and deeds over five decades conclusively refute the argument that retiree benefits expire. The Court concludes that the language of the agreements unambiguously promises lifetime health benefits for retirees, their eligible dependents, and their surviving spouses. The Court reaches this conclusion based on the agreements' plain language, which ties retiree health benefits to pension status, and which promises that retiree health benefits begin "at the time of retirement" and that they "shall be continued thereafter." This conclusion is supported by the *Golden-Meridian* precedents, by the contractual context, by the Defendants' admissions, and by Defendants' conduct and the other extrinsic evidence discussed above.

In conclusion, the Court finds that Plaintiffs are likely to succeed on the merits of their LMRA and ERISA claims to enforce Defendants' promises of lifetime retiree health benefits. The Court now turns to the other factors prerequisite to the issuance of a preliminary injunction.

B.    Remaining preliminary injunction factors. As noted, district courts consider four factors when addressing preliminary injunction motions: (1) "plaintiffs' likelihood of success on the merits"; (2) "whether the plaintiffs could suffer irreparable harm without the injunction"; (3) "whether granting the injunction will cause substantial harm to others"; and (4) "the public interest." *Golden v. Kelsey-Hayes Co.*, 73 F.3d at 653.

1.    Irreparable harm. "Numerous courts have found that reductions in retiree insurance coverage constitute irreparable harm, meriting a preliminary injunction." *Golden v.*

41

*Kelsey-Hayes Co.*, 845 F.Supp. at 415.  Alteration and elimination of retiree health benefits causes

retirees and dependents health risk, uncertainty, anxiety, financial hardship, and other irreparable

harm.  *Fox*, 172 F.R.D. at 680; *Hinckley*, 866 F.Supp. at 1044; *Helwig*, 857 F.Supp. at  1179-1180;

*Schalk,* 751 F.Supp. at 1267-1268; *Yolton,* 318 F.Supp. at 472.

 In finding the retiree plaintiffs had shown irreparable harm, the district court in *Golden*, 845

F.Supp. at 415, relied on *Steelworkers v. Textron*, Inc., 836 F.2d 6 (1st Cir. 1987).  In *Textron*, the

court found irreparable harm based on "general facts that either are commonly believed or which

courts have specifically held sufficient to show irreparable harm":

> (1) most retired union members are not rich, (2) most live on fixed incomes, (3)
> many will get sick and need medical care, (4) medical care is expensive, (5) medical
> insurance is, therefore, a necessity and (6) some retired workers may find it difficult
> to obtain insurance on their own while others can pay for it only out of money that
> they need for other necessities of life....  We should then conclude that retired
> workers would likely suffer emotional distress, concern about potential financial
> disaster, and possibly deprivation of life's necessities (in order to keep up in
> insurance payments).
>
>  In short, taken together, these facts would show harm that, in this sort of case, is
> "irreparable."

*Textron*, 836 F.2d at 8.  The *Golden* court found that irreparable harm "would befall" the retirees

if "the modifications to plaintiff's health benefits continued." 845 F.Supp. at 416.  The Sixth Circuit

rejected the defendants' appeal, noting that the district court relied on decisions, including *Textron*,

holding that "retirees, primarily because of their fixed income, are unable to absorb even relatively

small increases in their expenses without extreme hardship."  *Golden*, 73 F.3d at 657.

 Plaintiff John Adams is a case in point.  He retired from the Rockwell plant in Detroit, where

he worked from 1943 until 1973.  (Ex. 197 at 45, 47).  Mr. Adams and his wife have received retiree

health benefits from Rockwell, Meritor, and ArvinMeritor for more than 30 years.  Mr. Adams is

85. Mrs. Adams is 82. They have been married since 1940. (Ex. 197 at 11, 78). They live on a fixed income: Mr. Adams' pension (about $478 monthly), Mrs. Adams' pension (about $200 monthly), and their combined Social Security ($1,317 monthly), totaling under $2,000 a month. Mr. Adams testified: "It takes just about all of that to take care of the bills per month." He and Mrs. Adams have no savings and are unable to set aside money. When asked by defense counsel if he has "any money left over" after paying his expenses, Mr. Adams answered: "not enough to do nothing with." (Ex. 197 at 48, 84, 126-127). Since ArvinMeritor cancelled dental coverage, Mrs. Adams had several thousand dollars of dental work and Mr. Adams has been "going without" needed services because they "cost too much money." Mr. Adams has been "going without" hearing aids for the same reason, although he can "hardly hear." (Ex. 197 at 128, 155-156). Mr. Adams suffers from "old age" and "pain all over my knees and in my feet." Mrs. Adams has diabetes. They each see doctors once or twice each month. (Ex. 197 at 151- 153). If ArvinMeritor proceeds as planned, Mr. and Mrs. Adams will lose their remaining health benefits on January 1, 2006. Because of the benefits changes, Mr. Adams is "upset" and suffering "stress" and "emotional distress." (Ex. 197 at 143-144, 151-152). The Court concludes, in the words of *Textron*, that like "most retired union members," Mr. and Mrs. Adams are "not rich," live on "fixed incomes," need medical care, and are suffering "irreparable harm" because of defendants' broken promises. 836 F.2d at 8. Mr. and Mrs. Adams are not alone. *(See e.g.*, Ex. 118, 128, 133-140, 197, 202, 203, 205-208).

The Court concludes that absent an injunction, irreparable harm is certain. *See Golden,* 845 F.Supp. at 415-416 and 73 F. 3d at 657 (granting preliminary injunction based on "affidavits from retirees" and on decisions "showing that retirees, primarily because of their fixed incomes, are unable to absorb even relatively small increases in their expenses without extreme hardship"); *Fox,*

43

172 F.R.D. at 680 ("the threat of irreparable harm is ever present"), *aff'd sub nom Fox v. Varity Corp.,* 91 F. 3d 143, 1996 WL 382272, *2 (6th Cir. 1996)(Ex. 63) (recognizing the "unique position of retirees" and citing *Golden* and *Textron* as finding that "retired union workers are particularly sensitive to even small increases in the costs of insurance coverage"); *Helwig,* 857 F. Supp at 1179-1180 ("Numerous courts have found that reductions in retiree health insurance coverage constitute irreparable harm, meriting a preliminary injunction."); *Hinckley*, 866 F.Supp. at 1044 (same); *Yolton*, 318 F.Supp. 2d at 472 ("the Court can surmise that the putative class members overall cannot afford" self-paid health insurance); *Schalk*, 751 F.Supp. at 1267-1268 ("a cost shift to retirees ... constitutes irreparable harm"; "uncertainty and worry ... is also a form of noncompensible injury for retirees living on a fixed income"; "uncertainty posed by the lack of knowing just how much money will be needed to cover medical expenses ... also poses irreparable harm").

      2.    <u>Alleged "delay</u>." Defendants do not contest the harm to the retirees. Nor do they contest that irreparable harm would result from the elimination of benefits planned for January 1, 2006. Rather, they dispute that the harm caused by Defendants' 2003 and 2005 changes are "irreparable" based on Plaintiffs' "delay" in seeking injunctive relief. While in some cases delay in seeking injunctive relief may put the severity of harm in doubt, the Court concludes that this is not the case here. Here, the continuing and future harm to retirees is irreparable.

<u>First</u>, the Court concludes there was no delay in addressing Defendants' plan to eliminate benefits for the vast majority of retirees, dependents, and surviving spouses on January 1, 2006. Early on, Plaintiffs told Defendants they would move for a preliminary injunction to stop the elimination of benefits planned for January 1, 2006 and to undo the already-imposed cancellations. In August, the Court set a November 1 deadline for Plaintiffs' motion. Plaintiffs filed their motion

44

on October 18, 2005, 12 days before the deadline and 74 days before Defendants' planned 2006 action.  The Court finds that Plaintiffs were diligent.

Second, the Court concludes that an injunction is necessary to prevent future irreparable harm.  Irreparable harm to aging retirees will occur if Defendants' planned 2006 benefits elimination is not prevented and if already-cancelled benefits are not reinstated.  Any delay in addressing cancellation of benefits does not diminish its devastating future impact.  Indeed, the harm to aging retirees without adequate health care is continuing and cumulative, and is exacerbated by the passage of time.  If the Court does not require Defendants to provide promised benefits, irreparable harm will be "ever present."  *See Fox*, 172 F.R.D. at 680 (rejecting argument that "delay in bringing this motion is clear evidence" negating "irreparable injury"; "due to the nature of the harm, the threat of injury is ever present").

Third, much of what Defendants call delay is due to Defendants.  Although the complaints were first filed in September 2003 (by UAW, in what later became *Cole*) and in September 2004 (in *Faust*), Defendants did not file answers until December 2004.  In the period between the first complaint and the Defendants' first answer, the parties met to discuss possible resolutions, but did not resolve the cases.  Then the focus shifted to litigation and procedural diversions -- Defendants' transfer motion and prolongation of class certification issues because of "conflict" discovery.  "Merits" discovery never began; it was stayed at Defendants' request.  Accordingly, Plaintiffs had to rely on investigation to gather evidence -- spanning 43 years, 12 plants in six states, and the 14 national "master" agreements effective between 1962 and 2003. Plaintiffs did their investigation, and filed their motion well before the Court's November 1, 2005 deadline.  Plaintiffs have been diligent, and Defendants have no legitimate complaint about "delay."  *See Yolton*, 318 F.Supp. at

45

472 ("plaintiffs' delay does not negate a showing of irreparable harm, particularly given the information plaintiffs' needed to gather in order to file their motion").

Forbearance, for whatever reason, does not negate Retiree Plaintiffs' right to take action now to enforce Defendants' promises and prevent continued and future harm. *Hinckley*, 866 F.Supp. at 1042 (timing "merely indicates that the substance of the more recent changes have prompted [retirees] to seek relief"). Nor does delay eliminate the ever present harm caused by the continuing and planned additional breaches. *Fox*, 172 F.R.D. at 680. Moreover, any delay in addressing the earlier changes does not diminish the continuing harm to aging retirees, or the future harm which will result from Defendants' planned elimination of health coverage for all retirees, dependents and surviving spouses "age 65 or over." The Court concludes that a new and significant level of irreparable injury will begin on January 1, 2006 if the Court does not intercede. Accordingly, the Court grants the Retiree Plaintiffs' motion for preliminary injunction.

        3.   <u>Conclusion</u>. The Court concludes that the Retiree Plaintiffs have demonstrated that retirees, dependents, and surviving spouses will suffer irreparable harm absent an injunction and further, that the balance of harm favors an injunction. Courts "have found similarly that the harm caused an employer that is required to maintain health benefits because of a preliminary injunction is outweighed by the harm caused to retirees forced to go without medical care or forced to choose between basic necessities in order to pay premiums and deductibles." *Golden v. Kelsey-Hayes Co.*, 845 F.Supp. at 416. Finally, the Court concludes that the public interest lies with enforcement -- through preliminary injunctions -- of the ERISA rights of "participants in employee benefit plans and their beneficiaries" and, under LMRA, the collectively-bargained rights of retirees and dependents to "health insurance ... for the rest of their lives." *Schalk,*

46

751 F.Supp. at 1268; *Yolton*, 318 F.Supp. at  473; Employee Retirement Income Security Act (ERISA) Section 2, 29 U.S.C. §1001(b).

In sum, the Court finds that the Retiree Plaintiffs have satisfied the four prerequisites and are entitled to the preliminary injunction they seek.  The Court orders the reinstatement of benefits which were unilaterally eliminated in 2003 and 2005, and enjoins the termination of benefits announced for January 1, 2006.

## IV.  BOND

The Court now turns to the final issue, bond.  The "rule in our circuit has long been that the district court possesses discretion over whether to require the posting of security."  *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (1995)(no bond).  Based on factors such as retirees' "financial condition," the "likelihood of their success on the merits," Defendant's "admission of its obligation," and the public interest, courts may grant preliminary injunctions requiring continuation of collectively-bargained health benefits with no bond or with a nominal bond.  *See Mamula v. Satralloy, Inc.*, 578 F.Supp. 563, 579 (S.D. Ohio 1983) (no bond due to retirees' impecunious financial conditions and likelihood of success); *Warner v. Ryobi Motor Products Corp.*, 818 F.Supp. 907, 909 (D. S.C. 1992) ($250 bond where a "great number" of the retiree plaintiffs had limited assets and "a strong likelihood of prevailing").

Defendants focus on the UAW strike fund, arguing in essence that the union is a deep pocket.  In fact, the union strike fund is constitutionally restricted and is in reserve for impending strike-related crisis.  (*See* Ex. 178-179).  In any event, Defendants' focus is misplaced.  The Court does not believe that the UAW strike fund should be a consideration in addressing a bond for this injunction, and the Court orders that the injunction issue without bond.

47

## V.  PRELIMINARY INJUNCTION

## PRELIMINARY INJUNCTION DIRECTING DEFENDANTS TO REINSTATE AND MAINTAIN RETIREE HEALTH BENEFITS

Pursuant to the Retiree Plaintiffs' motion for preliminary injunction, the Court having considered the papers, evidence and testimony submitted by the parties and presented at the December 13, 2005 hearing, and the Court being otherwise advised, pursuant to Rule 65 and for the reasons stated in the Court's opinion it is hereby ordered:

Defendants shall reinstate and resume paying the full cost of health benefits for retirees from the UAW-represented collective bargaining units in the 12 plants addressed in these actions, and for their surviving spouses, and other eligible dependents.  These benefits shall be reinstated to their levels prior to the changes implemented by Defendant ArvinMeritor in 2003 and 2005.

Defendants are enjoined from eliminating retiree health benefits planned for January 1, 2006 and shall make no changes in existing and reinstated retiree health benefits provided to any member of the proposed classes unless authorized to do so by further order of this Court.

In the circumstances of this case, no bond need be posted.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  December 22, 2005


I hereby certify that a copy of the foregoing document was served upon counsel of record on December 22, 2005, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager

48