UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ROBERT COLE, ET AL.,                                    Case No. 03-73872

        Plaintiffs,                                    Honorable Nancy G. Edmunds

v.

ARVINMERITOR, INC., ET AL.,

        Defendants.
_____/


**OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT [73] AND GRANTING PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT AND PERMANENT INJUNCTION [74] AS TO LIABILITY BUT
RESERVING ISSUES AS TO REMEDIES; i.e., IMPLEMENTATION OF PERMANENT
INJUNCTION AND DAMAGES**


This litigation is brought by Plaintiffs, six retirees and one surviving spouse (collectively, the "Retiree Plaintiffs") and United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW"), against the Retiree Plaintiffs' former employers and current benefits administrator, Rockwell Automation, Inc. and Rockwell International Corporation (collectively "Rockwell") and ArvinMeritor, Inc.  It addresses the duration of retiree health benefits under a series of collective bargaining agreements ("CBAs") that span five decades.  Defendants planned to eliminate health benefits on January 1, 2006 for all retirees, dependents, and surviving spouses age 65 and over.  It had already reduced and cancelled some health benefits in 2003 and 2005, triggering these consolidated actions.

Plaintiffs challenged Defendants' actions in an earlier motion for preliminary injunction. This Court granted the Retiree Plaintiffs' motion on December 22, 2005, concluding that Plaintiffs had demonstrated a likelihood of success on the merits of their claim that the CBAs governing their retirement unambiguously promise lifetime health care benefits. *Cole v. ArvinMeritor, Inc.*, Nos. 03-73872, 04-73656, 2005 WL 3502182, *18 (E.D. Mich. Dec. 22, 2005). The Court's December 22, 2005 Order directed Defendants to "reinstate and resume paying the full cost of health benefits" and enjoined Defendants from cancelling or changing the reinstated health benefits. *Id.* at *28.

This matter is now before the Court on the parties' cross-motions for summary judgment.[1] The issue to be decided here is the same as in Plaintiffs' motion for preliminary injunction: Whether the language of the parties' CBAs promised lifetime retiree health benefits or terminated those benefits at the end of each three-year CBA term. Applying general principles of contract interpretation and construing each provision as a part of the integrated whole, this Court concludes that the CBAs unambiguously promise lifetime retiree health benefits. *Accord*, *Yolton v. El Paso Tennessee Pipeline Co.*, 435 F.3d 571 (6th Cir. 2006); *McCoy v. Meridian Auto. Sys., Inc.*, 390 F.3d 417 (6th Cir. 2004); *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648 (6th Cir. 1996). This Court DENIES Defendants' motion for summary judgment and GRANTS Plaintiffs' motion for summary judgment and permanent injunction as to liability but RESERVES issues concerning remedies; i.e., implementation of the permanent injunction and damages.

---

[1]Plaintiffs also seek to make the preliminary injunction permanent.

2

## I.    Facts

In their complaint, the Retiree Plaintiffs allege that:  (1) Defendants breached labor agreements in violation of Section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. §185, and (2) breached fiduciary duties under the labor agreements which constitute employee welfare plans within the meaning of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001, *et seq.*, in violation of Section 502(a) of ERISA, 28 U.S.C. § 1132(a).

### A.  Plaintiffs

Retiree Plaintiffs bring this suit on their behalf and on behalf of a proposed class of approximately 2,900 retirees, their eligible dependents and surviving spouses.  Retiree Plaintiffs and the proposed class of retirees retired from 12 plants owned by Rockwell or, later, by Rockwell successors Meritor Automotive, Inc. and ArvinMeritor, Inc.  The plants were in Michigan, Ohio, Wisconsin, Indiana, Illinois, and Kentucky.  All retirees were represented by UAW at those plants and, since retirement, have received retiree health benefits from Defendants.  The retirees' dependents and surviving spouses have also received health benefits from Defendants due to their relationships to the retirees.

### B.  Defendants and Plants At Issue

Rockwell International Corporation ("Rockwell") was formed in 1973 in a merger between North American Rockwell and Rockwell Manufacturing.  Rockwell was a conglomerate of multiple divisions which owned and operated industrial plants throughout the United States, including plants supplying the automotive industry.  (Ex. 528, Greb Af. ¶¶4-5).  In 2003, Rockwell International changed its name to Rockwell Automation, Inc.

3

In October 1997, Rockwell "spun-off" its automotive division, which became Meritor Automotive, Inc.

In July 2000, Meritor merged with Arvin Industries to form ArvinMeritor, Inc. ArvinMeritor describes itself as an "$8 billion supplier to the motor vehicle industry" with "approximately 31,000 employees in 25 countries," including 10,000 in the United States. (Ex. 180).

Rockwell owned various plants at which UAW was the collective bargaining representative of hourly employees.  (Ex. 528, Greb Af. ¶5).  Among these are the 12 plants at issue, located in Allegan, Chelsea, and Detroit, Michigan; Ashtabula (2 plants) and Marysville, Ohio; Oshkosh, Wisconsin; Knox, Indiana; Chicago (2 plants) and Centralia, Illinois; and Winchester, Kentucky.  (Ex. 102).

Rockwell, Meritor, or ArvinMeritor closed or sold each of the 12 plants over time, between the early 1970s and 2003.  (Ex. 104-105).

## C.  Benefit Changes

In 1991, Rockwell added a mandatory mail and generic drug program for all retirees. These changes were made to cut down on the substantial costs of brand name drugs and to take advantage of bulk purchasing through mail-order pharmacies.

In 2000, Defendants announced that all *Faust/UAW* retirees who retired before January 1, 2001 would realize an increase in drug co-pays from $3 to $5 for generic drugs and $3 to $7 for brand name drugs.  This represents an increase of 100%.

In 2001, ArvinMeritor froze reimbursements for Medicare Part B premiums at the 1999 level (*i.e.*, $45.50) for age 65/older UAW retirees from closed plants.  This change substantially increased out-of-pocket costs for all age 65/older retirees.  At Medicare's 2005

4

monthly premium rate of $78.20, *Cole/UAW* retirees currently pay approximately $392.40 more per year as a result of ArvinMeritor's 2001 decision to freeze the Medicare Part B premium reimbursement at $45.50.

In 2003 and 2005, ArvinMeritor, the administrator of the retiree health benefits, changed some of these benefits.  ArvinMeritor cancelled the dental, hearing aid, and vision coverages.  ArvinMeritor also increased co-pays, deductibles and out-of-pocket maximums, and altered Medicare Part B reimbursements, resulting in increased costs to retirees, dependents, and surviving spouses.

In 2005, ArvinMeritor announced plans to eliminate remaining health benefits on January 1, 2006 for all retirees, dependents, and surviving spouses "age 65 or over."

The *Cole* action was filed on September 29, 2003, Case No. 03-73872.  The *Faust* action was filed on September 20, 2004, Case No. 04-73656.  The Court subsequently consolidated these actions in Case No. 03-73872.

### D.  The Parties' Collective Bargaining Agreements (CBAs)

The health benefits that are the subject of this lawsuit are governed by a series of UAW-negotiated agreements binding Defendants.  For simplicity, the Court will use the 1991-1994 Rockwell-UAW agreement as a typical example of language which remained essentially unchanged over the five decades in question.  (*See* Ex. 106-117, 157).

In the period between 1962 and 2003, UAW and Rockwell, Meritor, or ArvinMeritor were parties to a series of "national" collective bargaining agreements (CBAs) governing the plants and UAW-represented employees.  (Ex. 102, 106-117, 157, 195, 196).  These agreements addressed pensions and retiree health benefits.  Company-paid retiree health benefits were established in 1962, with Rockwell paying one-half.  (Ex. 187).  In the 1965-

5

1967 agreement, Rockwell became responsible for paying in full the cost of health benefits for retirees, eligible dependents, and surviving spouses. (Ex. 186, 187, 196). The 1968-1971 agreement established the core language regarding retiree health benefits that continued in the 1971-1974, 1974-1977, 1977-1980, 1980-1983, 1982-1985, 1985-1988, 1988-1991, 1991-1994, 1994-1997, 1997-2000, and 2000-2003 national agreements. (Ex. 106-117, 157). Over those years, retiree health benefits required by the agreements improved in various ways -- e.g., prescription drug, dental, hearing aid, and vision coverages were added -- but the core contract language providing for company-paid health benefits for retirees, their eligible dependents, and their surviving spouses remained essentially unchanged. (Ex. 101, 106-117, 157).

The contractual framework, begun in 1965, includes: (1) a "supplemental agreement" governing health benefits for active employees, retirees, and dependents "made part of" the national agreement, designated Exhibit "B," and (2) incorporated into Exhibit "B," a detailed program of health benefits "made part of" the supplemental agreement, designated Exhibit "B-1." (*See* Ex. 106 and 157).

Thus, this "insurance program" consists of Exhibit "B" (hereinafter "Insurance Agreement") and "B-1" (hereinafter "Insurance Program") to the main agreements (CBAs). The main agreements also typically include a "Pension Plan" as Exhibits "A" and "A-1" and a "Supplemental Unemployment Benefit Program" (SUB) as Exhibits "C" and "C-1." In the 1990s, the SUB program was replaced by a Guaranteed Income Stream (GSI) program for laid off employees. All the exhibits are negotiated and "made part" of the main collective bargaining agreements "as if set out in full herein, subject to all provisions of" the main agreement. (*See* Ex. 114, ¶N-144).

6

## II.    Standard for Summary Judgment

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice.  Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III.   Analysis

Defendants argue that they are entitled to summary judgment because:  (1) all the case law the Court relied on in granting Plaintiffs' motion for preliminary injunction is either

7

distinguishable or wrongly decided in the first instance; (2) each three-year CBA at issue has two duration clauses (one in the National Agreement and one in the Insurance Agreement) that end all health benefits provided under that CBA when its term expires; (3) because the "shall be continued thereafter" language in the Insurance Program (Exhibit "B-1") conflicts with the duration clause in the Insurance Agreement (Exhibit "B"), the negotiated rule of construction in the Insurance Agreement must be used to resolve this conflict; (4) application of that negotiated rule of construction defeats Plaintiffs' claim that health benefits for retirees extend beyond the date of each CBA applicable to each individual retiree (e.g., if you retire in 1994 days before the 1991-1994 CBA expires, then your health coverage expires on that date as well); (5) because Defendants' SPDs limit benefits to the term of the CBA, the claims of all retiring after 1968 must be dismissed as untimely, *see Maurer v. Joy Technologies*, 212 F.3d 907, 919 (6th Cir. 2000); (6) because Defendants' 2003 SPD had an unfettered reservation of the right to cancel benefits, Retiree Plaintiffs' claims must be dismissed as untimely; and (7) there was never a meeting of the minds as to the duration of health insurance benefits.

In their cross-motion, Retiree Plaintiffs respond that: (1) this Court correctly applied prevailing Sixth Circuit precedent and general principles of contract interpretation and correctly concluded that the CBAs governing their retirement unambiguously promise lifetime retiree health benefits; and (2) Defendants merely repeat arguments rejected by this Court and the Sixth Circuit. This Court agrees with Retiree Plaintiffs. It begins by discussing the general principles that govern resolution of the core issue presented here, applies those principles, and addresses Defendants' arguments where applicable.

### A. General Principles

8

In a recent decision addressing the same issue presented here, the Sixth Circuit Court of Appeals stated the basic principles that guide this Court's analysis.  *See Yolton v. El Paso Tennessee Pipeline Co.*, 435 F.3d 571 (6th Cir. 2006).  Although retiree health care insurance benefit plans are welfare benefit plans governed by ERISA, they are different from pension plans because "there is no statutory right to lifetime health benefits."  *Id.* at 578 (internal quotes and citations omitted).  "If lifetime health benefits exist for the plaintiffs, it is because the UAW and the defendants agreed to vest a welfare benefit plan."  *Id.* Without such an agreement as to vesting, the employer is generally free to modify or discontinue retiree health benefits once the CBA providing such benefits expires.  *Id.*  If, on the other hand, there is such an agreement and "a welfare benefit has vested, the employer's unilateral modification or reduction of those benefits constitutes a LMRA violation."  *Id.* (citing *Maurer v. Joy Tech., Inc.*, 212 F.3d 907, 914 (6th Cir. 2000)).

The Sixth Circuit's decision in *UAW v. Yard-Man, Inc.*, 716 F.2d 1476, 1479 (6th Cir. 1983), "recognized that parties to CBAs can agree to vest benefits that survive the termination of the agreement."  *Id.*  Its decision in *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648 (6th Cir. 1996), "clarified that in determining the intent of the parties to a CBA, 'basic rules of contract interpretation apply.'"  *Id.* (quoting *Golden*, 73 F.3d at 754).  Accordingly, "courts should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent", interpret each provision in question as part of the integrated whole", and "[i]f possible," should construe each provision "consistently with the entire document and the relative positions and purposes of the parties."  *Id.* at 578-79 (internal quotes and citations omitted).  If the Court determines that ambiguities exist, it "may look to other provisions of the document and other extrinsic evidence."  *Id.* at 579 (citing *Yard-*

9

*Man*, 716 F.2d at 1480; *Golden*, 73 F.3d at 654).

The *Yolton* Court, acknowledging that the *Yard-Man* decision has "generated controversy", dismissed the same complaints about that decision and the *Yard-Man* "inference" that Defendants raise here. *Yolton*, 435 F.3d at 579. In *Yard-Man*, the Sixth Circuit observed that "retiree benefits are in a sense 'status' benefits which, as such, carry with them an *inference* that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree." *Yard-Man*, 716 F.2d at 1482. Subsequent cases have clarified that "'there is no legal presumption based on the status of retired employees.'" *Yolton*, 435 F.3d at 579 (quoting *Int'l Union, United Auto. Workers v. Cadillac Malleable Iron Co.*, 728 F.2d 807, 808 (6th Cir. 1984). Likewise, in *Golden*, the Sixth Circuit observed that "*Yard-Man* does not shift the burden of proof to the employer, nor does it require specific anti-vesting language before a court can find that the parties did not intend benefits to vest." *Golden*, 73 F.3d at 656. Rather, the courts may, under *Yard-Man*, "*infer* an intent to vest from the context and already sufficient evidence of such intent. Absent such other evidence, [the courts] do not start our analysis presuming anything." *Yolton*, 435 F.3d at 579.

The *Yolton* Court further clarified that the Sixth Circuit "has never inferred an intent to vest benefits in the absence of either explicit contractual language or extrinsic evidence indicating such an intent. Rather, the inference functions more to provide a contextual understanding about the nature of labor-management negotiations over retirement benefits. That is, because retirement health care benefits are not mandatory or required to be included in an agreement, and because they are 'typically understood as a form of delayed compensation or reward for past services' it is unlikely that they would be 'left to the

10

contingencies of future negotiations.'" *Id.* at 580 (quoting *Yard-Man*, 716 F.2d at 1481-82). "When other contextual factors so indicate, *Yard-Man* simply provides another inference of intent. All that *Yard-Man* and subsequent cases instruct is that the Court should apply ordinary principles of contract interpretation. There is no need to revise, reconsider, or overrule *Yard-Man.*" *Id.*

## B. Application of General Principles of Contract Interpretation

Contrary to Defendants' arguments here, this Court merely followed the analytical framework prescribed in *Yard-Man* and applied basic principles of contract interpretation to construe the explicit language of the CBAs to conclude that the language unambiguously promised "health benefits for each retiree's lifetime and for the lifetime of each retiree's eligible dependents and surviving spouses." *Cole*, 2005 WL 3502182 at **14-15. It does so again in the context of the parties' cross-motions for summary judgment.

Applying general principles of contract law in its task of interpreting the CBAs, and observing that the language here is "virtually identical" to that at issue in the *Golden-Meridian* precedents,[2] this Court once again concludes that language in the CBAs show

---

[2]The *Golden-Meridian* precedents referenced here and in this Court's Order granting Retiree Plaintiffs' motion for a preliminary injunction are: (1) *McCoy v. Meridian Automotive Systems, Inc.,* No. 03-74613 (E.D. Mich. Feb. 6, 2004)(O'Meara, J.)(granting preliminary injunction for retirees based on the 1991-1994 Rockwell-UAW agreement)(Ex. 569); **(2)** *McCoy v. Meridian Automotive Systems, Inc.*, 390 F.3d 417 (6th Cir. 2004) (upholding preliminary injunction for retirees based on the 1991-1994 Rockwell-UAW collective bargaining agreement); **(3)** *McCoy v. Meridian Automotive Systems, Inc.*, No. 03-74613 (E.D. Mich. Feb. 28, 2005)(O'Meara, J.)(Ex. 129)(granting summary judgment for retirees based on the 1991-1994 Rockwell-UAW agreement); **(4)** *Golden v. Kelsley-Hayes Co.*, 845 F.Supp. 410 (E.D. Mich. 1994)(Gadola, J.)(granting preliminary injunction for retirees based on language "virtually identical" to that in the 1991-1994 UAW-Rockwell agreement); **(5)** *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648 (6th Cir. 1996)(affirming decision to grant preliminary injunction); and **(6)** *Golden v. Kelsey-Hayes Co.*, 954 F.Supp. 1173 (E.D. Mich. 1997)(Gadola J.)(granting summary judgment for retirees).

that Defendants intended that "once retirement status is attained, health benefits are to continue 'thereafter,' i.e., for the duration of retirement."  *See Cole*, 2005 WL 3502182 at *24.  Defendants' *Yard-Man* complaints are without merit.

### 1.  CBA Language Showing Intent to Provide Lifetime Health Benefits

Similar to the Sixth Circuit's decisions in *Golden, McCoy* and *Yolton*, this Court once again finds that language promising that retiree benefits begin "at the time of retirement" and "shall be continued thereafter" and tying retiree health benefits to pension status unambiguously promises lifetime health benefits.  *Id.* at * 17.  *See also Yolton*, 435 F.3d at 580*; McCoy*, 390 F.3d at 423; and *Golden,* 73 F.3d at 656.

The Court arrives at this conclusion by examining several sections in Exhibit "B," which is titled "Supplemental Agreement (Insurance Program)," and Exhibit  "B-1," which is titled "Rockwell International Corporation Insurance Program for Hourly-Rate Employees."  In particular, it examines the sections in Exhibits "B" and "B-1" that apply to retired employees, their eligible dependents, and surviving spouses and other sections of the CBA referenced in those sections.

### a.  Insurance Agreement and Pension Plan Agreement Language

Exhibit "B," Section 2(a), provides:  "The Company agrees to pay the contributions due from it for the Program in accordance with the terms and provisions of Exhibit B-1."  (Ex. 157, 1991-1994 Agreement, Exhibit "B" at 2).

---

Other cases relied on by the Retiree Plaintiffs as addressing language "similar" to that addressed in *Golden v. Kelsey-Hayes* are:  **(1)**  *Hinckley v. Kelsey-Hayes Co.*, 866 F.Supp. 1034, 1041 (E.D. Mich. 1994)(Gadola, J.) and **(2)** *Yolton v. El Paso Tennessee Pipeline Co.*, 318 F.Supp. 2d 455, 466-467 (E.D. Mich. 2003)(Duggan, J.), *aff'd*, 435 F.3d 571 (6th Cir. 2006).

12

Exhibit "B-1," Article I, Section 3, is titled "Company Contributions and Administration." In various paragraphs, it provides for company-paid health benefits for various categories of persons, including employees "in active service," employees on "layoff or leave of absence," and, pertinent here, retired employees and surviving spouses.

Exhibit "B-1," Article I, Section (3)(b), is titled "Company Contributions for Health Care Coverages." Section (3)(b)(6) is titled "For Retired and Certain Former Employees." It ties retiree health benefits to pension status. In pertinent part, it provides:

> The Company shall contribute the full premium or subscription charge for Health Care ... coverages continued in accordance with Article III, Section 5, for: (i) a retired employee (including any eligible dependents), provided such retired employee is eligible for benefits under Article II of the Company's Hourly-Rate Employees Pension Plan....

(Ex. 114, Exhibit "B-1" at 19).

The pension plan section referenced -- Article II of Exhibit "A-1" -- provides for various types of retirements, including "normal retirement" at age 65, "early retirement" based on various formulas, including "30 and out" retirement, and disability retirement. (*See e.g.*, Ex. 157, 1991-1994, Exhibit "A-1" at 16-19, Ex. 114 at 16-19).

Article III, Section 5 of Exhibit "B-1" is referenced in Article I, Section (3)(b)(6) of Exhibit "B-1" quoted above.

Article III is titled "Health Care Benefits." (Ex. 114, Exhibit "B-1" at 65). Section 5 is titled "Continuance of Health Care Coverages Upon Retirement or Termination of Employment at Age 65 or Older." Section 5(a) addresses, among other things, "continuance" of health care coverages for pension-eligible retirees. It provides in pertinent part:

The Health Care ... Coverages an employee has under this Article at the time of

13

retirement ... shall be continued thereafter provided that suitable arrangements for continuation can be made with the Carrier(s).  Contributions for coverages so continued shall be in accordance with Article I, Section 3(b)(6).

(Ex. 114, Exhibit "B-1" at 72)

This language, tying pension status to retiree health benefits -- and providing that the health benefits "at the time of retirement ... shall be continued thereafter" for retirees and "any eligible dependents" -- constitutes an enforceable contractual promise of lifetime retiree health benefits to accompany lifetime pension benefits.

Similarly, regarding "surviving spouses," the Court examines Exhibit "B-1."

Article I, Section 3(b)(7) of Exhibit "B-1" provides in pertinent part:

(i) The Company shall make monthly contributions for the following month's (sic) Health Care ... Coverages on behalf of a surviving spouse as defined in Article III, Section 6(b)(1)(2)(3) and (4) ... and the eligible dependents of any such spouse; provided, however, that the contributions on behalf of a surviving spouse for the month the surviving spouse becomes age 65 and subsequent months shall be made only for months that the surviving spouse has the voluntary coverage that is available under the Federal Social Security Act by making contributions.

(Ex. 157, 1991-1994 Agreement, Exhibit "B-1" at 20).

The reference to Federal Social Security Act coverage is to Medicare Part B coverage available to those age 65 and over.

Article IV, Section 1 of Exhibit "B-1" provides for reimbursement of retiree-paid Medicare Part B premiums.  It provides in part:

A retiree who is enrolled for Medicare coverage that is available by making monthly premium payments under the Federal Social Security Act, will, while so enrolled, receive a monthly benefit equivalent to the premium then in force provided the retiree is receiving a monthly pension benefit.

A surviving spouse who is enrolled for such Medicare coverage will receive the same monthly benefit, provided the surviving spouse is receiving a monthly pension benefit [excluding spouses of certain former employees who received

14

deferred pensions].

(*See* Ex. 157, 1991-1994 Exhibit "B-1" at 75).

Article III, Section 6 of Exhibit "B-1" is titled "Continuance of Health Care ... Coverages for Surviving Spouse of an Employee, a Retired or Certain Former Employee" and also ties surviving spouse benefits to pension status. Article III, Section 6(b), is referred to in Article I, Section 3(b)(7), and provides in pertinent part:

> The Company shall make suitable arrangements for a surviving spouse: (1) of [a] ... retired employee ... if such spouse is receiving or is eligible to receive a survivor benefit under Article II of the Company's Hourly-Rated Employees Pension Plan, [or] (2) of a retired employee if, prior to the retiree's death, the retiree was receiving a benefit under Article II of the Hourly-Rated Employees Pension Plan, [or] .... (4) of an employee who at the time of death was eligible to retire on an early or normal pension under Article II of the Company's Hourly-Rated Pension Plan, to participate in the Health Care ... coverages referred to in Section I of this Article ....

(Ex. 114, Exhibit "B-1" at 73).

All of the above contract language specifically promises, without time limitation, that the health benefits for retirees, eligible dependents, and surviving spouses are to begin "at the time of retirement" and "shall be continued thereafter" and ties those health benefits to pension status. The Court thus interprets the relevant CBAs as unambiguously promising health benefits for each retiree's lifetime and for the lifetimes of each retiree's eligible dependents and surviving spouses. *See also Cole*, 2005 WL 3502182 at *15.

### b. Retiree Medical Cost Caps

This Court's contract interpretation finds additional support in Exhibit C to the 1994-1997, 1997-2000, and 2000-2003 CBAs, entitled "Retiree Medical Cost Caps." Exhibit C provides for cost-sharing of premium increases above a formula-based threshold, with a downward adjustment or freeze first when a retiree "reaches Medicare eligibility" (i.e., age

15

65), and later when the retiree "reaches age 80." A "Hypothetical Example" is also provided illustrating how the cap would work in years well beyond the expiration of the CBA. (Ex. 229, 1994-1997 Agreement at 145-46; Ex. 116, 1997-2000 Agreement at 152-53; Ex. 117, 2000-2003 Agreement at 87-88.) As this Court previously recognized, "[t]hese cost-controlling caps are future oriented, and govern retiree health costs for decades after expiration of the agreements in which they appear." *Cole*, 2005 WL 3502182 at *20.

### 3. Defendants' Duration Arguments

Similar to the defendants in *Yolton*, Defendants here argue that language in duration clauses in both Article XIX of the CBA and the Insurance Agreement (Exhibit "B") "demonstrates that the health insurance benefits were not intended to vest and were only to last as long as the CBA." *Yolton*, 435 F.3d at 580. Defendants, like the defendants in *Yolton*, urge this Court to find that this language means that a "retiree's health insurance coverage is subject to change every few years based on new bargaining agreements." *Id.* This Court, like the *Yolton* Court, rejects Defendants' duration arguments.

### a. General as Opposed to Specific Duration Clauses

First, despite Defendants' arguments to the contrary, both the duration provision in Article XIX of the National Agreement and Section 10 in the Insurance Agreement are general duration clauses.[3] Defendants do not contest that the provision in Article XIX is a

---

[3]In their briefs, Defendants use the Article and Section numbers from the 1968-1971 CBA. This Court used the 1991-1994 CBA as a reference in its Opinion and Order granting Plaintiffs' motion for preliminary injunction. It continues to do so here. The language in each is virtually identical.

16

general duration clause.[4]  They do, however, dispute that description of Section 10 in the Insurance Agreement, arguing that it is instead a specific duration clause.  This Court disagrees.

Section 10 provides that:

**Duration of Agreement**

> This [Insurance] Agreement and [Insurance] Program as modified and supplemented by this Agreement shall continue in effect until the termination of the National Agreement of which this is a part.

(Ex. 157, 1991-1994 Agreement, Exhibit "B", Insurance Agreement, § 10 at 13.)[5]  Unlike the duration clause discussed in *Yard-Man*, 716 F.2d at 1482-83, the duration clause in Section 10 of the Insurance Agreement (Exhibit "B") does <u>not</u> make reference to the parties' negotiated Pension Plan programs or expressly state that health benefits tied to that Pension Plan "continue only for the duration of the CBA" as did the clause in *Yard-Man.*  Rather, as this Court previously concluded, it is a general durational clause that does not override the specific promises in the CBAs for lifetime health benefits.  *Cole,* 2005 WL 3502182 at *17.

In *Yolton*, the Sixth Circuit reaffirmed the principle that a general duration clause does not trump contractual promises of lifetime retiree health benefits.  It observed that, "general durational provisions only refer to the length of the CBAs and not the period of time contemplated for retiree benefits.  Absent specific durational language referring to retiree

---

[4]Article XIX of the 1991-1994 National Agreement provides that it "[s]hall continue in full force and effect without change until 10:00 a.m., July 19, 1994."  (Ex. 157, 1991-1994 National Agreement at 84, ¶ N-143.)

[5]Virtually the same language is contained in Section 8 of the Insurance Agreement, Exhibit "B" to the 1968-1971 CBA.  (Ex. 581, Exhibit "B", Insurance Agreement, § 8 at 126.)

benefits themselves, courts have held that the general durational language says nothing about those retiree benefits." *Id.* at 580-81 (internal quotes and citations omitted).

Applying that reasoning to the CBAs at issue in *Yolton*, the Court interpreted such "concurrent language" as doing "nothing to those employees who have already retired under the plan. The durational language only affects *future* retirees – that is, someone who retired after the expiration of a particular CBA would not be entitled to the previous benefits, but is rather entitled only to those benefits newly negotiated under a new CBA. Thus, the retirement package available to someone contemplating retirement will change with the expiration and adoption of CBAs, <u>but someone already retired under a particular CBA continues to receive the benefits provided therein despite the expiration of the agreement itself.</u>" *Id.* at 581 (emphasis added).[6]

This Court finds the reasoning and result in *Yolton* applies here as well. Other language in the CBAs likewise defeats Defendants' durational arguments.

**b. Pension Plan and Insurance Program have Similar Duration Clauses**

As this Court and the *Yolton* Court, 435 F.3d at 581, have observed, "each pension agreement – Exhibit 'A' – has a durational clause virtually identical to the durational clause in Exhibit 'B' in each insurance agreement." *Cole*, 2005 WL 3502182 at *19. Despite the substantial similarity in these duration clauses, Defendants argue that, although vested pension benefits do not end when a CBA expires, health benefits do. This Court disagrees.

_____

[6]The *Yolton* Court further observed that, "[t]his is perhaps where the *Yard-Man* inference makes the most sense. Retirees, who have left their bargaining unit, and can no longer rely on their unions to maintain their benefits, are not likely to leave their benefits alterable based on the changing whims and relative bargaining power of their former union and employer." *Id.* at 581 n.6 (citing *Golden*, 845 F. Supp. at 413).

18

Virtually identical language would not be used if it was intended to have one meaning as to health benefits and another as to pension benefits.  As the *Yolton* Court observed, the similarity of this contract language "further bolsters the interpretation . . . that the expiration of a CBA affects only future retirees in the context of benefits.  Reviewing 'each provision in question as part of the integrated whole,' the use of similar language . . . provides substantial support for the plaintiffs's position."  *Yolton*, 435 F.3d at 581 (quoting *Yard-Man*, 716 F.2d at 1479).

### c.  CBAs' Differential Treatment of Active Employees and Retirees

The Court further observes that Exhibit "B-1" differentiates between active employees, inactive employees, and retirees and surviving spouses with regard to "continuance" of health benefits.  For example, active employees, laid-off employees, employees on leaves of absence and SUB-eligible employees all are subject to specific durational limitations.  Employees in "active service" are entitled to continued company-paid health benefits for "any month in which the employee has earnings from the Company."  (Ex. 114 at 15, Exhibit "B-1," Article I, Section 3(a)(1)).  When an employee is laid off from active service, or takes a leave of absence, health benefits are continued only in the first month after the month of layoff or the beginning of the leave.  (Ex. 114 at 18, Exhibit "B-1," Article I, Section 3(b)(2)(i)).  Laid-off employees eligible for SUB benefits under Exhibit "C" and "C-1," however, are entitled to continued health benefits under a schedule, determined by seniority, for up to 24 months after they become inactive.  (Ex. 114 at 69, Exhibit "B-1," Article III, Section 3(a)).

In contrast, retiree benefits are not subject to any durational limits.  Rather, retiree benefits begin "at the time of retirement" and "shall be continued thereafter."  (Ex. 114,

Exhibit "B-1," Article III, Section 5(a) at 72).  Consistent with the decision in *Yolton*, 435 F.3d at 581-82, this Court finds that language that specifically sets durational limits on health care benefits for laid-off and other employees, but sets no such limitation for retirees, demonstrates that company and union negotiators know how to set specific limits on the continuation of health benefits, did so for employees on lay off and leave, but set no such limits on the continuation of health benefits for retirees, their dependents, and their surviving spouses.

As it did previously, this Court finds that the parties intended to distinguish between various categories of employees for specific purposes.  "For example, continuation of health benefits for SUB-eligible employees for up to 24 months is intended to cushion the hardship of layoff.  Continuation of health benefits tied to pension status is intended to provide retirees with the lifetime security of health benefits.  This purpose is accomplished by language promising that health benefits 'at the time of retirement ... shall be continued thereafter.'"  *Cole*, 2005 WL 3502182 at * 20.

### d.  *Cleveland Gear* and *Bittinger* Are Easily Distinguished

Furthermore, consistent with the decision in *Yolton*, 435 F.3d at 582, this Court distinguishes the language in this case from that at issue in the cases Defendants rely upon.  *See UAW v. Cleveland Gear Corp.*, No. C83-947, 1983 WL 2174 (N.D. Ohio Oct. 20, 1983); *Bittinger v. Tecumseh Products Co.*, 83 F. Supp.2d 851 (E.D. Mich. 1998), *aff'd*, No. 98-1933, 98-1978, 1999 WL 1204883 (6th Cir. Dec. 8, 1999).  Although the CBA in *Cleveland Gear* had general durational language in both the CBA and in the insurance agreement (as is true here), "the agreements in *Cleveland Gear* did not contain language that tied health insurance benefits to pension benefits" as was the case in *Yolton* and is the

20

case here. *Yolton*, 435 F.3d at 582. *Bittinger* is distinguishable for the same reason. "[T]he agreements in *Bittinger* were devoid of any language that tied health insurance benefits to pension benefits." *Id.*

### 4. Defendants' "Rule of Construction" Argument

Defendants argue that, because the "shall be continued thereafter" language in the Insurance Program (Exhibit "B-1") conflicts with the duration clause in the Insurance Agreement (Exhibit "B"), the negotiated rule of construction in the Insurance Agreement must be used to resolve this conflict.[7] This Court previously rejected this argument. *Cole*, 2005 WL 3502182 at *19. It does so again. Simply stated, there is no conflict to be resolved. "[G]eneral durational clauses are not in conflict with – and do not override – specific promises of benefits that begin 'at the time of retirement' and are to be 'continued thereafter.'" *Id.*

### 5. Defendants' Extrinsic Evidence

As discussed above, the unambiguous language of the CBAs does not require the consideration of extrinsic evidence. Nonetheless, Defendants attempt here to argue away its admissions and extrinsic evidence of the intent to provide retirees with lifetime health benefits; i.e., "lifetime" letters (Ex. 134, 139, 141-50, 182); "for life" prescription drug cards (Ex. 151-52, 176, and 188); and course of conduct over five decades. *See Cole*, 2005 WL 3502182 at **21-22, 24. The Court now evaluates Defendants' extrinsic evidence proffered as support of its argument that the parties never intended to provide retirees with lifetime health benefits.

---

[7]Defendants cite *Haytcher v. ABS Industries, Inc.*, 889 F.2d 64 (6th Cir. 1989) and *UAW v. Textron, Inc.*, 359 F.2d 966 (6th Cir. 1966) as support.

21

### a. Changes in Health Benefits

Defendants again argue that, because they made unilateral benefit changes 1991, 2000, 2001, 2003, and 2005, and negotiated co-pay changes in 2000, this demonstrates the parties' intent that retiree health benefits were not for life. The Court previously rejected this argument. *Cole*, 2005 WL 3502182 at *23. There is no history of unilateral material changes, and, even if there were, it would be of no consequence. That Plaintiffs tolerated earlier changes does not bar them from suing for later changes. *Id.* (citing *Hinckley*, 866 F. Supp. at 1042; *Helwig v. Kelsey-Hayes Co.*, 857 F. Supp. 1168, 1174 n.2 (E.D. Mich. 1994); and *Schalk v. Teledyne, Inc.*, 751 F. Supp. 1261, 1266-67 (W.D. Mich. 1990), *aff'd* 948 F.2d 1290 (6th Cir. 1991)).

### b. Lack of Union Proposals or Highlights for Lifetime Health Benefits

Defendants again urge this Court to find significant the absence of written union proposals or highlights regarding lifetime retiree health benefits. The Court reiterates its rejection of these arguments:

> Finally, Defendants argue that there are no union proposals for lifetime retiree health benefits or union literature trumpeting this valued right. It is not proposals or supposed union reticence that is significant, however; it is Defendants' words and deeds. Whatever proposals crossed the bargaining table in the 1960s, the parties agreed to language which explicitly ties retiree health benefits to pension status, and which promises that coverages an employee has "at the time of retirement ... shall be continued thereafter." That language or its equivalent appears in 13 national agreements, governing retirements from 1965 to 2003. The genesis of this language fifty years ago is meaningless. It was agreed to by both parties. Moreover, the absence of proposals is persuasively explained in the testimony of UAW negotiator Roger Bernardez. When asked by defense counsel why UAW made no written proposal for lifetime retiree health benefits in the 1980, 1982, and 1985 negotiations, Mr. Bernardez explained: "... didn't need one. It was there." (Ex. 199 at 92). Indeed, the "shall be continued thereafter" language was agreed to in 1968, and was preceded by similar language dating back to 1962. Mr. Bernardez also testified about the status of retiree health

22

benefits in the 1980s: "We already had them." (*Id.* at 89-90).

*Cole*, 2005 WL 3502182 at *23.

### c.  Internal Union Communication

Defendants again cite as support internal union communications from 1997 made by Alan Sawitski suggesting "stronger language," although Defendants acknowledge that "stronger language" was "never submitted as a proposal during negotiations." (Defs. Mot. at 22-23; Ex. 564, 6/16/97 letter.)  As Mr. Bernardez testified, the UAW did not propose changes in the 1968 core language because there was no need.  *Cole*, 2005 WL 3502182 at *23 (quoting Ex. 199 at 92.)  It is of no significance that Mr. Sawitski suggested internally the use of "stronger language."  As Mr. Isaacson testified, there is "a lot of disagreement" within the union "on what should be or should not be proposed."  (12/13/05 Hrg. Tr. at 33.)  Mr. Sawitski also testified that his 1997 suggestion was discussed within the union bargaining committee and, by consensus, "dropped" as unnecessary. (Ex. 216, A. Sawitski Dep. at 139.)

As further extrinsic support, Defendants also provide a 1997 letter to a UAW Vice President written by Russ Sawitski, Alan's brother who retired in 1992 and was never a negotiator.  Russ Sawitski suggested to UAW officials (as did his brother several months later) that stronger language was needed in the CBAs as to vesting of retiree health benefits. (Ex. 601, 2/24/97 letter.)  Defendants attempt to use hearsay in that letter about a 1992 conversation Russ Sawitski had with a UAW administrative assistant where he claims he was told that it was the Union's position that retirees do have lifetime health benefits even though there were no provisions.  This attempt fails for several reasons. First, it is inadmissible hearsay.  Second, as discussed above, testimony from UAW

23

negotiators and officials established that suggestions for stronger language as to lifetime vesting for retiree health benefits was dropped as unnecessary.

### d.  Defendants' Supporting Declarations

Defendants, undeterred by this Court's prior decision, once again argue that its Stone, Strickland, Crotty, Ooms, and Needham Declarations show that Defendants only agreed to provide retiree health benefits for the duration of the CBA in effect at the time the employee retired.  This Court's preliminary injunction decision discussed these declarations in detail and concluded that they were unpersuasive, "insufficient to counter the explicit agreement language", and "inadequate to overcome the substantial evidence confirming that the benefits were intended and understood by Defendants to last for the lifetimes of retirees, eligible dependents, and surviving spouses."  *Cole*, 2005 WL 3502182 at *24.  The Court recognized that the Stone Declaration is "largely argument, opinion, legal conclusion, and factual conclusion without adequate foundation."  *Id.* at *24, n.3, ¶ A.  The Court found the Strickland Declaration "similarly offers a restatement of Defendants' argument" and is "diametrically opposed" to the agreement and SPD language.  *Id.* at *24, n.3, ¶ B.  The Court also found that the Crotty, Ooms, and Needham Declarations "suffer from similar infirmities", "merely restate the Defendants' arguments", "lack foundation and specificity" and "ignore the express contract language that Rockwell agreed to at every national negotiation since 1962."  *Id.* at *24, n.3, ¶ C.  Defendants have not persuaded the Court that its earlier rulings as to these Declarations were in error.

### e.  Retiree Plaintiffs' Oral and Written Evidence of "Lifetime" Assurances

Defendants again summarily dismiss Retiree Plaintiffs' substantial evidence of written assurances of lifetime health benefits from Defendants, arguing that they can be ignored

24

because they came from "low-level functionaries." This Court once again disagrees, finding

these "lifetime" assurance letters to be admissions by Defendants of their intent to provide

lifetime retiree health benefits.

> Defendants' admissions include the "lifetime" letters (Ex. 134, 139, 141-150, 182). These come from different Rockwell, Meritor, and ArvinMeritor officials in Michigan, California, and Wisconsin. They come from officials who held titles like "Retiree Insurance Supervisor," "Benefits Representative" and "Benefits Administrator." They come from company offices with names like "Benefits Department," "Retirement Administration," "Automotive Benefits Office," and "Retiree Operations." They span the 13 year period between 1988 and 2001. They were sent to retirees and surviving spouses in Michigan, Ohio, Kentucky, and Wisconsin. Nine expressly use the word "lifetime." Others use the words "life," "will continue" and "for life." The Court concludes that these letters reflect company policy and are admissions by Defendants of the lifetime duration of retiree health benefits. *See Golden*, 954 F. Supp. at 1188 (citing the defendants' benefits representatives written assurances of lifetime health coverage).

> Defendants' acknowledgment of the lifetime duration of retiree health benefits is reflected, too, in the decades of Rockwell health benefits booklets and SPDs which promise that company-paid retiree health benefits are "for life" (Ex. 161 at 59) and "will be continued during your retirement" for retirees and dependents. The agreement language – "shall be continued thereafter" – and the booklet language – "will be continued during your retirement" – are definitive proof that the duration of retiree health benefits coincides with the duration of retirement.

*Cole*, 2005 WL 3502182 at *21.

One of the company officials who gave "lifetime" assurances is Dorothy Musser. She

was on the company bargaining teams in 1997 and 2000. (Ex. 116 at 85; Ex. 117 at 40;

Ex. 143 and 146; Hrg. Tr. at 53, 138.) Ms. Musser was a company benefits representative

and "the person" who the UAW "dealt with" when it "had benefits issues, health care

issues." (Hrg. Tr. at 53-54, 138; Ex. 189.) In 1988 and 1990, Ms. Musser wrote to

surviving spouses, promising, e.g.: "You will continue to have your medical, dental, vision,

hearing and prescription drug coverage at no cost to you *for your lifetime*." (Ex. 143 and

146 (emphasis added).)  Ms. Musser is currently ArvinMeritor's Manager of Health Care Planning and the author of a declaration submitted to this Court in May 2005 in support of Defendants' unsuccessful transfer motion.

As in its prior Opinion and Order, this Court again observes that Defendants' oral "lifetime" assurances were accompanied by written assurances; e.g., the 1971 Rockwell health benefits book (Ex. 161 at 59); "for life" prescription drug cards issued by Rockwell's carrier in 1972, 1973, 1980, 1982, 1983, and 1984 (Ex. 151-52, 176, 188, 217, 220-227); and decades of Defendants' health benefits booklets which assured retirees that "[u]pon retirement under the pension plan, these coverages will be continued during your retirement for yourself and for your eligible dependents" (Ex. 162-175).  *Cole*, 2005 WL 3502182 at *22.

### f.   Defendants' Reliance on *Maurer* is Misplaced

Defendants, citing *Maurer v. Joy Technologies, Inc.*, 212 F.3d 907, 918 (6th Cir. 2000), argue that the claims of Retiree Plaintiffs who retired after 1968 are barred because they "failed to timely sue over SPD language limiting benefits to the term of the CBA." (Defs.' Mot. at 27-29.)  Defendants' reliance on *Maurer* is misplaced.

In *Maurer*, the Sixth Circuit applied *Yard-Man* and distinguished *Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir. 1998) (*en banc*), because it "dealt with an employer that had unilaterally instituted a retiree benefit program," not a CBA.  *Id.* at 917.  It rejected arguments, similar to those Defendants raise here, that general durational clauses apply to retiree benefits.  "The durational provisions [the defendant company] cites are general in nature, and only refer to agreements between the parties, not to benefits created by the agreements."  *Id.* at 918.  Rather, the *Maurer* Court instructed, the courts should look at the

26

CBAs to determine whether retiree benefits were intended to vest.  If so, then these benefits could not be changed unilaterally.  *Id.*  The Court found contract language showing an intent to "vest retirement benefits for individuals retiring before mid-1991, when reservation of rights language applicable to retirees was distributed to plaintiffs."  *Id.*

Again distinguishing *Sprague*, the Court further held that reservation of rights language printed in an earlier 1986 insurance plan booklet was not effective as to retirees under that 1986 CBA because it was never distributed to these retirees.  *Id.*  Reservation of rights language in an August 19, 1991 booklet was, however, effective as to "those plaintiffs retiring after August 19, 1991" because "the Union was obligated to grieve or enter suit over the reservation of rights clause as the clause was conspicuously contained in the 1991 insert and plaintiffs did not dispute it until the filing of [their] lawsuit in 1994."  *Id.* at 919 (internal quotation omitted).

In *McCoy*, 390 F.3d at 424-25, the Sixth Circuit distinguished the "explicit and sweeping authority to retract coverage" asserted by the employer in *Maurer* from the qualified language in a Rockwell SPD, making the employer's reservation of rights subject to the terms of the applicable CBA.  This Court likewise observed that "the five decades of SPDs and benefits booklets issued by Rockwell, Meritor, and ArvinMeritor before 2003 all have language that supports Plaintiffs, making Defendants' prerogatives "subject to" the collective bargaining agreements.  They also promise that health benefits "will be continued during your retirement for you and your eligible dependents."  *Cole*, 2005 WL 3502182 at *22.  *See also, id.* at **22 n.2, 9-10, 16 and Exhibits cited therein.  Accordingly, *Maurer* does nothing to advance Defendants' arguments.

**g.  The 2003 SPD and Filing of this Suit**

Defendants once again argue that Retiree Plaintiffs claims are barred because they failed to act prompt enough to challenge a 2003 SPD that they contend broadly asserted ArvinMeritor's unilateral authority to terminate retiree health benefits.  This Court once again rejects this argument.  *See Cole*, 2005 WL 3502182 at \*22.

In February 2003, Defendants sent out a letter to retirees, notifying them that, effective April 1, 2003, changes would be made to retiree healthcare benefits and that they would receive an updated Summary Plan Description (SPD) in March 2003.  (Ex. 600.)  In markedly smaller print, after the signature line, the letter states:  "Please note:  ArvinMeritor reserves the right to make future changes to its benefit plan as necessary."  (Ex. 600 at 2.)

In March 2003, Defendants sent out the 2003 SPD.  It contains reservation-of-rights language on pages 1 and 76, respectively:

> The information contained in this book supersedes any prior Summary Plan Description you may have received for your medical coverage . . . .  By participating in the Plan, you are deemed to agree to all the terms and conditions of the Plan.

> ArvinMeritor, Inc. hopes to continue this Plan indefinitely, but reserves the right to amend, modify, suspend or terminate the plan, in whole or in part, at any time.

> * * *

> **Amendment and Termination**

> Although it is intended that the Plan will continue indefinitely, ArvinMeritor, Inc., reserves the right to amend, modify or terminate it at any time by action of its Board of Directors.  In some situations, the Plan may also be amended or terminated by the Chairman of the Board and Chief Executive Officer, the Senior Vice President, Human Resources, or the Vice President, Compensation and Benefits.  Changes to the Plan will be made by written amendments to the official Plan document.

> In the event of a conflict between the terms of the Plan Document and this

28

SPD, the terms of the Plan Document shall control.

(Ex. 516 at 1, 76.)

Defendants, relying on *Maurer*, argue that this language bars <u>all</u> Retiree Plaintiffs from pursuing claims for vested health benefits, not just those retiring after receipt of the March 2003 SPD. *Maurer* does not lend support to Defendants' argument. As discussed above, the unqualified reservation-of-rights in *Maurer* was held to apply only to those employees who had retired after obtaining notice of that language <u>and</u> had failed to timely challenge the employer's ability to do so. It did not apply to those employees who had retired before such notice and thus had vested retiree benefits. Unlike *Maurer*, Retiree Plaintiffs and the UAW here have timely challenged ArvinMeritor's 2003 reservation-of-rights. As this Court previously observed:

> The 2003 SPDs are dated on the same day that ArvinMeritor cancelled the retirees' vision, dental, and hearing aid coverage and made other changes, all challenged in this litigation. Defendants cannot justify breaching their agreements on April 1, 2003 by issuing booklets self-declaring Defendants' authority to breach the agreements. Nor can Defendants' unilateral actions nullify their obligations under the collective bargaining agreements.

*Cole*, 2005 WL 3502182 at *22.

### h.  "Meeting of the Minds"

Defendants, relying on *USWA v. North Bend Terminal Co.*, 752 F.2d 256 (6th Cir. 1985), argue that there was never a meeting of the minds as to the duration of retiree health insurance benefits. *North Bend* is easily distinguished. Here, unlike the facts in *North Bend*, the parties expressed their intent in unambiguous contract language. Even if the Court had found the contract language ambiguous, the extrinsic evidence supports the conclusion that the parties intended that retiree health benefits were vested for life.

29

**IV.  Conclusion**

For the above-stated reasons, Defendants' motion for summary judgment [73] is

DENIED.  Plaintiffs' motion for summary judgment and permanent injunction is GRANTED

as to liability, but the Court is reserving issues concerning remedies; i.e., implementation

of the permanent injunction and damages.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  September 13, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record
on September 13, 2006, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager